Filed 4/27/15 Reposted to correct superior court docket number; no change to opinion text.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff and Respondent,　　　　)
　　　　　　　　　　　　　　　　　　　　)　　　　S112442
　　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　　Shasta County
PAUL GORDON SMITH, JR.,　　　　　　　)　　Super. Ct. No. 98F2652
　　　　　　　　　　　　　　　　　　　　)
　　　　Defendant and Appellant.　　　　)
_____)

A jury convicted defendant Paul Gordon Smith, Jr., of the first degree murder of Lora Sinner, with the special circumstance of torture.[1]  The jury also found defendant guilty of false imprisonment by violence and conspiracy to commit murder.  It determined that he used a deadly weapon and inflicted great bodily injury.[2]  The jury decided death was the appropriate penalty, and the court imposed that sentence.  This appeal is automatic.

We affirm as to guilt, but reverse the penalty judgment.  Defendant's violent attempt to escape from jail just before his trial began created difficult

---

[1]　　Penal Code sections 187, 190.2, subdivision (a)(18).  Further statutory references are to the Penal Code, unless otherwise indicated.

[2]　　Sections 182, 187, 236, 1203.075, and 12022, subdivision (b)(1).

Defendant was originally charged along with codefendants Lori Smith and Eric Rubio.  Smith and Rubio entered pleas before trial and were witnesses for the prosecution.  Another participant in the crimes, Amy S., was prosecuted as a juvenile, and also testified below.

problems for the court at various phases of the proceedings. We conclude that during the penalty phase, the court improperly excluded expert testimony about prison security measures for those sentenced to life without possibility of parole. The evidence was admissible to rebut the prosecution's evidence and argument suggesting that defendant would pose a danger in custody. Because we cannot say, beyond a reasonable doubt, that the penalty determination would have been the same had the jury heard from defendant's expert, we must reverse the penalty judgment.

I. FACTS

A. *Guilt Phase*

1. *Prosecution*

In December 1997, defendant was 21 years old and living with his father in Redding. During that month he met his younger half sister, Lori Smith, for the first time. Lori had been living in Washington State. Defendant's older brother, Timothy Smith, also arrived from Washington with his fiancée, Lora Sinner.[3]

Defendant married Jessica Smith in January 1998. Shortly thereafter, he began a relationship with Amy S., a 14-year-old runaway. Defendant's friend Eric Rubio became romantically involved with defendant's sister Lori. Sinner ended her engagement with Timothy and began to associate with defendant, Amy, Eric, and Lori. Toward the end of February this group, led by defendant, began an extended camping trip on private land in Shasta County.

Of the five, Sinner was the only person without a partner. She flirted with defendant, which angered Amy. Defendant returned Sinner's attention in order to maintain access to her car, which they used to drive into town from camp. About a

---

[3] For the sake of clarity, hereafter we refer to Lori Smith as "Lori," and to Lora Sinner as "Sinner."

2

week before Sinner's murder, Lori and Amy discussed beating her up, and defendant told Eric he wanted to "off this bitch," referring to Sinner. Lori testified that during a conversation with everyone except Sinner, defendant said Sinner should be killed. Eric remembered the conversation, but not who made the comment.

On the afternoon of the murder, Lori and Amy again spoke about beating Sinner. According to Lori, defendant encouraged them because he wanted Amy and Sinner to fight over him. Eric testified that defendant told him "the girls" wanted to fight Sinner, and he didn't know what to do about it. Eric said defendant displayed no signs of intoxication that afternoon. Toward the end of the day, Amy punched Sinner in the face. Sinner punched back, and Lori joined the fight. Defendant and Eric were in a tent about 15 feet away.

Amy testified that Lori knocked Sinner's head against a tree several times. Amy struck her in the head five or six times with a large can of chili, which she tossed aside after it was dented. Lori slammed Sinner's head into a large rock. Meanwhile, Amy retrieved two pieces of an automotive dent puller. One piece was a metal bar about an inch and a half thick and a foot long. The other was a weighted metal piece shaped like a barbell. As Sinner sat on the ground, Amy and Lori repeatedly hit her with these implements. Sinner was crying and asking them to stop. Amy admitted taunting Sinner during the assault.

Lori's account differed somewhat. She did not remember hitting Sinner's head on a tree or a rock, nor did she remember any taunting. She testified that after punching Sinner with her fists, she retrieved the dent puller bar from the tent. Defendant and Eric were watching the assault. Lori hit Sinner with the bar as hard as she could two or three times. She also hit her with the chili can after Amy dropped it.

3

Eric testified that he and defendant were in the tent when the fight started. They could hear but not see the beating. Defendant showed no interest, saying, "just let them fight." Amy had taken one piece of the dent puller from the tent, and Lori the other. Eventually, defendant intervened.

Amy confirmed that defendant stopped the fight. He told them to take Sinner down to the creek and clean her up. Lori maintained it was her idea to take Sinner to the creek. There, she and Amy scooped water onto Sinner's head to wash the blood from her hair. Eric and defendant also came to the creek. According to Lori, defendant took her aside, held out an ax, and said, "Just finish her off." Lori refused. Defendant had no apparent difficulty walking or talking; Lori did not know if he had taken any drugs that day. They all returned to the tent. Lori did not see what defendant did with the ax. The couples sat in the tent; Sinner sat on a mat outside the door.

Defendant produced a bottle of whiskey, which the couples shared. Defendant then gave the bottle to Sinner, telling her it would help with the pain. Sinner took a small drink. Defendant became angry, and asked Eric to help tie her up. After initially refusing, Eric put a noose around Sinner's neck. Defendant tied her hands and feet. Sinner was crying. Defendant, still angry, told her she was going to kill herself. He said she was in enough pain already and might as well join her mother, who had died recently. Declaring that Sinner's death was going to look like a suicide, defendant untied her hands, handed her a razor blade, and told her to cut her wrists. Sinner cried and refused at first, then cut her wrist once. Saying the cut wasn't deep enough, defendant took the blade, slashed her wrist, and handed the blade back to her. Sinner tried to inflict another wound. Defendant, unsatisfied, took the blade back and cut her wrist repeatedly.

Defendant told Sinner to hold her wrists over a fire pit. Lori testified that defendant struck Sinner's hands several times with the bar when she moved them.

4

He also kicked her in the forehead and poured whiskey over the bleeding cuts, causing Sinner to scream. He forced her to drink more liquor. Then he wrapped a plastic garbage bag around her head, cinching it tightly. Sinner continued crying and pleaded for help. Defendant struck her on the neck and back several times with the bar, then asked if anyone else wanted to hit her, looking at Lori. Lori was scared but wanted to prove she wasn't afraid to hurt someone. She hit Sinner with the bar twice in the head and neck, and said she was "hard to kill." Defendant snatched the bar, told Lori she wasn't doing it right, and hit Sinner several more times. When a blow produced a snapping sound, he stopped.

Eric and defendant buried Sinner. Lori testified that Eric was frightened and shaking. When the men returned, defendant said "she knew too much," and he feared she would say something. Lori understood him to mean that Sinner would tell the police he had been stealing purses from cars. Defendant warned the others that anyone who revealed what had happened would be the next to die. They agreed to say they had put Sinner on a Greyhound bus. The next morning, they burned her clothing and belongings at the burial site.

Amy's testimony about the events following the fight was roughly consistent with Lori's, though she was hazy on many details, particularly defendant's statements. She said defendant did not appear to be drunk or under the influence of drugs. She remembered Lori saying, "This bitch won't die" as she struck Sinner with the bar. Amy did not mention defendant having an ax, or asking Lori to "finish her off." Amy could hear Sinner breathing against the plastic wrapped around her head just before defendant and Eric carried her away to bury her.

Eric's account was similar. He said he did not join the others at the creek, but stayed on the bank with a flashlight, watching. He did not see defendant with an ax. Defendant said Sinner wouldn't survive because her skull was cracked and

the back of her head was "mushy." Eric admitted helping bind Sinner. He related that defendant cut Sinner's wrist, poured alcohol on the wounds, and kicked her in the head when she did not obey his directions. According to Eric, Sinner was still breathing after the final blow. Defendant then cinched the bags around her head and held them for 30 to 60 seconds, saying she would die more quickly that way.

Eric initially refused to help dispose of the body. Defendant told him he had better, "or I would end up just like her." Frightened, Eric helped defendant bury Sinner. They stripped the body first because, defendant said, it would decompose faster. Afterward, defendant instructed the others to say Sinner had gone back to Washington. He told them "we would all end up like her if we said anything." In the morning, they burned Sinner's clothes on top of the grave. Defendant said this would keep animals from digging her up.

The murder came to light some weeks later when Lori confessed to acquaintances that she and defendant had "beat and tortured" Sinner to death. While in jail, defendant participated in two videotaped interviews with detectives and two audiotaped interviews with a newspaper reporter. The tapes were played for the jury. In the first interview, defendant was given *Miranda* warnings and said he understood them. (*Miranda v. Arizona* (1966) 384 U.S. 436.) He denied committing the murder but said he would take the blame because he was the only one of the group who could tolerate prison. Eventually, he began providing details. He said Sinner could have died from either a head wound or asphyxiation, but "would have died regardless." He described her injuries, then recounted the following events after she was washed in the creek:

"Went back up to the top of the hill, resumed, she was tied up, laid down, by the fire pit, laughed at. Comments were made towards her, she was kicked, her hand was broken, she was hit in the back with a metal pipe, bar. She was hit in the back of the head, repeatedly in the back of the neck and the back of the head, I

6

remember the blood splattering. And she just didn't move no more. She wasn't making no noise. Just kind of like laid there, then . . . a piece of plastic was put around her face and then another piece of plastic, but she was already dead." Defendant admitted getting Eric to help him bury the body. He conceded he could have stopped the attack, and had no reason why he did not.

Defendant continued giving details, without identifying his role. He said Sinner "was . . . given options, suicide. . . . She was given a razor blade and told to cut her own wrists. . . . She uh couldn't cut her own wrists she was kind of too drunk . . . wrists were cut for her, deeper. A lot of blood. But that wasn't enough. . . . She was hit again with the pipe or the bar. . . . Either in the back of the head or the back of the neck, twenty, thirty, forty, fifty times, I don't know. . . . [S]he couldn't break her neck. Couldn't kill her." Defendant said Sinner had cried out in pain, but "it only brought more hits and more and more and more she kept trying, after every hit it got quieter and quieter. Then you heard a crunch. Something breaking, her neck breaking. . . . There was no more noise. She didn't move. Just laid there. And then there was a plastic bag or something on her head. We just held it there the whole time. She wasn't breathing . . . and then after a few seconds, it was only a few seconds, long enough to choke her, asphyxiate anybody."

Defendant said he had been "protecting her, but I couldn't protect her when it really counted." He admitted that Sinner had "suffered immense pain," and that "she was tortured." He said the others would not have said anything to the authorities because "they were too scared of me." He denied fearing that Sinner might have reported his crimes, explaining "she liked me way too much" to do that.

The next interview took place the following day. Defendant remembered his *Miranda* rights, repeating them himself for the detectives. They told him that

Amy and Lori had given them a complete account of what had happened, and asked defendant to explain his role. Defendant said the others were trying to protect him, commenting, "The only reason they didn't say something sooner is because they thought I'd kill them." Defendant continued to take the blame, because "a brother never rats on his sister." Told that Lori had given a written statement, defendant asked if she reported anything Sinner said about trusting him. He said that after the initial beating, he knew she would not survive. Defendant then offered to tell the detectives "a little story," if the recorder was turned off.

Evidently believing he was not being recorded, defendant gave a lengthy statement, including an excuse for not intervening to protect Sinner. When the assault began, he was in the tent with Eric. After drinking and smoking marijuana, defendant took four muscle relaxants. He heard screaming, and saw the attack. Lori came to the tent and got the two pieces of the dent puller, which Amy and Lori used to hit Sinner. Defendant claimed he was "mesmerized" and incapacitated by the drugs. He did not usually use medication, because he did not like to lose control. Sinner was calling him for help, but he was unable to move. Amy and Lori kicked and taunted her for a long time. After about an hour defendant was able to get up and make them take Sinner to the creek.

The back of Sinner's head was "mushy," the side of her neck was blue, and her face was bloody. She said she couldn't see. Her hands were swollen. Defendant brought her back to the tent and gave her whiskey. He pulled Eric aside and asked what they should do. Sinner would not survive, and defendant did not want to see her suffer. Eric tied her up, but defendant released her and started talking "into her ear." He asked about her mother, and Sinner said she loved her and wished she hadn't died. Defendant told her she was "probably going to go see [her] mom tonight, you're gonna die." He felt sorry and responsible, and offered to "kill her for her, and end the pain quickly, as fast as I could." He gave her more

8

whiskey, and obtained a razor. Sinner "didn't really want to die but she accepted the fact." After she tried to cut her wrist, defendant took the razor blade and attempted to do it himself, but was hampered by his drug ingestion and the flimsiness of the blade.

Frustrated, defendant "kept making her drink more whiskey," then sat down. Lori began beating Sinner again. Sinner was screaming by the time defendant was able to take the bar from Lori. He hit Sinner twice, and realized her neck was broken. Because she was still gasping for air, he wrapped the plastic bags around her face until she stopped breathing. Defendant told the detectives, "If I would have had a gun I would have just killed her faster, but I had no way to kill her faster. . . . First time in my life I haven't had a gun when I need one, when it really counted. She didn't want to die. I had to convince her. It's not even right, but I still feel I was in the right for, I mean, do I kill her or let her suffer through the whole night."

Defendant's interviews with the newspaper reporter took place in jail several days later. In the first, he said he had been under the influence of alcohol, marijuana, and medication. He had killed Sinner "out of mercy and with her permission." He heard the attack as it occurred but was unable to move because of the drugs. He planned to plead guilty if the district attorney dropped charges against the others. In the second interview, defendant was upset about the details that had appeared in the paper.

The forensic testimony established blood-alcohol levels of 0.78 and 0.88 percent in blood extracted from Sinner's heart. There were at least nine incisions on her left wrist, all superficial. While not life threatening, they would have been painful. Pouring alcohol over them would have exacerbated the pain. The cause of death was blunt force head injuries, with asphyxiation a possible contributing cause. The exceptionally high blood-alcohol level could have been an additional

9

fatal factor, but the level detected may have been influenced by postmortem migration of alcohol from the stomach to the heart.

2. *Defense*

The defense presented numerous witnesses to impeach the truthfulness and reliability of Lori Smith. An investigating detective recounted inconsistent statements made by Lori and Eric Rubio. Forensic testimony challenged the reliability of the blood-alcohol levels found in Sinner's blood samples. A psychiatrist testified about the effects of the muscle relaxant and other drugs defendant claimed to have ingested.

B. *Penalty Phase*

1. *Prosecution*

The victim's father, aunt, and brother testified about her life and the impact of her death. Similar testimony was given by her minister, her supervisor at a program where she worked assisting developmentally disabled adults, and a high school counselor.

Prosecution witnesses related numerous acts of violence defendant committed while housed in group homes or juvenile hall. In March 1990, at the age of 12, defendant ran away from a work project and swung a broken glass bottle at a supervisor. When restrained, he continued to resist. Defendant told the deputy who took him to a mental health facility that he wanted to kill himself. Several months later defendant was suspected of helping to force one boy to orally copulate another resident at a group home. Later, defendant kicked that boy in the head, and was expelled from the program.

In 1991, defendant stabbed a group home staff member with a pen and bit him. Five adults restrained defendant while he flailed violently. He was subsequently admitted to a mental health facility. In 1992, defendant punched a group home resident in the jaw without warning. The victim required surgery and

his jaw was wired shut for weeks. Defendant was arrested. In 1995, he was housed in a high-security unit at juvenile hall. He tapped on his cell door to get the attention of a counselor, then slid a knife fashioned from a flattened Pepsi can under the door. Shortly thereafter, he struck another resident in the mouth and used a racial epithet.

The prosecution also presented evidence about an assault defendant committed shortly before Sinner's murder. Michael Murchinson testified that in February 1998, he was with defendant and others as they drove back from Reno. They were running out of money. Murchinson and defendant first considered robbing a convenience store, then decided to target a prostitute. They picked up a woman and drove to an industrial area. After having intercourse with her, defendant confronted her with a gun. She screamed and ran away. Defendant fired a shot. He and Murchinson drove away with the woman's purse. However, defendant discovered he had dropped his wallet. They went back to look for it and were arrested.

The jury heard about a number of incidents in the county jail after defendant's arrest for Sinner's murder. In April 1999, he wrote his wife about escaping, and asked her to take photographs of the jail's exterior. He told her he would not die in jail, but would "go out in a blaze of glory." She contacted law enforcement. The jury heard a recording of a phone call between defendant and an agent who pretended to be his wife's friend. They discussed the photographs and how to get them to defendant.

In August 1999, a six-inch steel shank and a corner section of a metal tray were found in defendant's cell. He admitted these items were his and said he was going to use them on a fellow inmate.

In February 2001, guards noticed water coming from defendant's cell. He had blocked the window in the cell door. When the water supply to his cell was

11

cut off, defendant began yelling and kicking, and threatened a guard. Attempting to move defendant to a more secure cell, the guards opened the cell door and sprayed him with pepper spray, but he had wrapped a T-shirt around his head and covered his eyes with a plastic bag. A cell extraction response team was summoned. A videotape of the extraction showed four guards, wearing protective gear, removing defendant from his cell after rolling in a "flash bang" grenade that scattered hard rubber pellets. Defendant was strapped into a restraint chair and examined by a nurse.

A 28-inch baton, made of tightly rolled newspaper secured with elastic, was found in the cell. Hard and dense, the baton did not bend or break when struck against a concrete table. A few days later, defendant told a guard that one of his ears was still ringing, and that the grenade had surprised him. He had expected them to use a beanbag shotgun, which he had planned to take away from them.

In May 2002, defendant planned an escape with fellow inmate Ben Williams. Defendant approached Aaron Cozart, a newly incarcerated inmate, and asked him to create a distraction by taking a hostage and forcing a cell extraction. Meanwhile, defendant and Williams would knock out a window and use a rope made of bedsheets to retrieve weapons and tools brought by a recently released inmate named Tim. Tim would place some money in defendant's jail account when everything was ready. The target date was May 17th or 18th. Cozart made some phone calls and spoke to Tim, who failed to appear on the appointed dates. Defendant said they would go ahead the following week, but Cozart changed his mind and reported the plot. A deputy confirmed that a Timothy Yakiatis had deposited funds in defendant's account on May 15th. The conspirators were moved to different cells.

In June 2002, defendant became angry with guard Timothy Renault over a scheduling issue. Renault overheard defendant tell another guard that if he ever

got out "there would be a fight, and he would get me." The next night inmate Harold Seems saw defendant walking toward the shower next to Seems's cell. He heard defendant ask, "Do you have it?" A voice that Seems recognized as Ben Williams's answered, "Yes." Defendant said, "We're going to have to kill him." Williams replied, "Real fast." Seems assumed they were planning to assault a guard, and wrote a note of warning. Some time later, Renault appeared on his rounds. Seems held up the note and made a warning gesture. Renault ran toward a nearby door. Williams and defendant emerged from the shower, grabbed Renault, and dragged him toward the shower.

Renault testified that he entered defendant's cell pod around 3:50 a.m. He noticed Seems at the window of his cell door, with a scared look on his face. Seems whispered, "Get out of here." Renault headed for the door and radioed the control room. As he reached for the door, he heard a shower curtain open. He turned to see Williams crouching, and a second figure in the shower stall. The two men attacked, forcing Renault into a corner and hitting him repeatedly. It felt like he was being held and hit by more than one person. The first deputy to respond heard screaming and saw defendant walking away from the shower. Williams was striking Renault's face. Deputies tackled and handcuffed Williams. Renault, covered with blood, told them that defendant and Williams had attacked him.

Nearby, deputies found a metal drain grate backed by a bar of soap wrapped in twine and strips of bedsheet, with a handle formed of tightly rolled paper. The grate in Williams's cell was missing. Renault suffered numerous injuries, including lacerations in his scalp and mouth, a skull fracture, a blood clot on the brain, fractures of the cheekbone and eye socket, a broken jaw, and a broken tooth. Plates and screws were installed in his skull and jaw to stabilize the fractures.

As defendant walked away from Renault, he passed by Seems's cell. Seems saw blood on defendant, and a bloody cloth hanging out of his pants. Deputies

13

found blood on his hands, forearms, and shoulder. Concealed in his clothing were a two-foot-long strip of bedsheet stained with blood and a razor wrapped with twine. A piece of torn towel was tucked into the front of his underwear. Blood was spattered on his clothes and shoes. In defendant's cell, deputies found another newspaper baton and a length of string with padded loops on each end, which would have protected the fingers if the string was used as a garrote. A paper bag bearing defendant's name was found in the shower. It contained clothing, toiletries, and two lengths of rope made from sheets, one 12 feet long and the other nearly 50 feet long.

2. *Defense*

Defendant presented extensive evidence of an abusive childhood. He was the third of six children. They lived in a filthy home where they were neglected and beaten. Child Protective Services (CPS) was notified, but took no action until defendant's father told a psychologist that he had been sodomizing defendant and his brother Timothy for years. Defendant was victimized from the age of two and a half until he was five. His father pleaded guilty to several counts of sodomy and served time in prison.

Defendant was five years old when the children were removed from the household. While some of the children were eventually returned, defendant and Timothy were not. Defendant was placed with 13 different caretakers from 1983 to 1990. The county's CPS unit was underfunded. Mental health services were limited; social workers received no training on the effects of child sexual abuse. A supervisor who reviewed defendant's file testified that his was the worst situation the department had addressed. The damage done to defendant as a child was as severe as any the supervisor had encountered.

Numerous witnesses chronicled defendant's increasingly difficult progression through foster homes, group homes, and eventually the California

14

Youth Authority (CYA). In 1985, after two years with a foster parent who considered herself only a temporary caretaker, defendant was placed with a foster mother known for her work with boys from difficult backgrounds. He developed a close relationship with her, but she decided to go to graduate school. In 1987 her foster home was converted to a group home, which was run by her son Ken Sloan.

Defendant also became close to Sloan, who referred to him as "son" and assured defendant he would always be there. However, Sloan became distant as time passed. When the principal of defendant's elementary school asked Sloan about the relationship, he described defendant as "one of the kids at the home." Reminded of his earlier assurances to the child, Sloan replied, "things change." Defendant became angry, hostile, and aggressive. He reported that Sloan hit him with a two-by-four. Another resident testified that Sloan regularly imposed harsh physical punishments. Defendant ran away several times. Sloan was investigated and ultimately barred from employment in any State Department of Social Services facility. Defendant told an investigator that Sloan was as close as he had gotten to a father figure, and that he repeatedly asked Sloan to adopt him.

Defendant was transferred from Sloan's home in 1989. The new foster mother described him as "a very angry little boy." After two months the placement was terminated because defendant threatened the foster mother and another child. After one day in another foster home, defendant was moved to a new placement, where his brother Timothy joined him. He was removed from that home after three months because he was hitting his brother. In the next group home, defendant threatened a staff member with a broken bottle and spoke of suicide, leading to another transfer. In March 1990 he spent two weeks in a foster home, but was removed when he threatened to burn the house down. His subsequent placement was the one in which he was suspected of forcing one boy to orally copulate another, and from which he was later expelled when he kicked the victim.

15

After the kicking incident, defendant's social worker recommended that he be transferred to the jurisdiction of the juvenile probation department. A misdemeanor battery charge was sustained in juvenile court. A supervising probation officer testified that he had gotten to know defendant over the course of several periods of custody from 1990 through 1994. He liked defendant, and had no problems with him. He and his wife had discussed adopting him. The wife, who was a counselor at juvenile hall, testified that it was a difficult decision. She thought defendant would benefit from a family situation, but they decided against adoption. They had two teenage daughters, and adoption would have required them to leave their current employment.

In early 1991, defendant was living in a group home where he became acquainted with the bookkeeper, who let him do homework in her office. She liked him, found him very bright, and sometimes took him home with her on weekends. He got along well with her children. She considered bringing him into her home permanently. However, her fiancé objected, she became pregnant, and ultimately decided she could not take defendant in. She explained the situation to him in a long conversation, and told him they would stay in touch. After she left the group home, defendant wrote letters and telephoned, begging her to let him live with her. It took him a year to accept her decision. Ultimately she cut off contact, feeling it was not good for him to hold on to a dream that would not be fulfilled.

Defendant spent the latter part of 1991 at a residential treatment center. His therapist testified that he was disruptive and angry, distrusting any adult. She considered him to be severely damaged emotionally. The placement ended when defendant assaulted staff members.

Some months later, defendant was placed in another residential facility. The program director testified that he "acted out" from the beginning. He was

prone to fits of rage, would bang his head on the wall, and was resistant to both group and individual counseling. He trusted no one, feared adults, and had no serious emotional attachments. One counselor, however, testified that he got along well with defendant, and thought they were making progress until defendant injured himself playing baseball, which "interfered with his program." Shortly after the injury, defendant was expelled. He and another resident had violated the program's rules by leaving the facility, taking a staff member's rifle from the cab of a pickup truck, and using it to shoot at squirrels and other objects in a field.

In 1994, defendant lived in a group home where, the operator testified, he did well. However, on a home visit defendant was involved in an incident that resulted in a CYA commitment. A juvenile justice expert testified about defendant's years under CYA jurisdiction, based on a review of the agency's records. From February 1995 until his discharge in November 1997, defendant was consistently unable to maintain relationships with peers or staff. He was rebellious and a constant management problem, receiving increasingly restrictive placements. By the time he was paroled, he was in the highest security CYA facility. However, he did well in school, earning his high school degree.

Defendant testified at the penalty phase. He remembered only one incident of sodomy by his father. His father said it was punishment for being bad. He and his brother had cried beforehand, because they knew what was going to happen. He had little memory of his mother. Defendant gave accounts of his various foster care placements. He remembered Ken Sloan promising to adopt him, and being impatient for that to happen. However, Sloan changed, becoming prone to fits of anger and imposing harsh punishments. Defendant's social worker did not believe him when he reported the abuse. Eventually, defendant began running away.

At his next placement, defendant said he was unable to handle the freedom allowed by the foster mother. He acknowledged that his behavior was

17

noncompliant, but did not understand why. Defendant attributed the group home kicking incident to a therapy session where the victim was instructed to intentionally anger defendant, which he did by bringing up the history of defendant's abuse by his father. Defendant denied that the forced oral copulation occurred. After the age of 12 or 13, he had many problems with lack of self-control. Sometimes he would regret his actions, and sometimes he felt they were justified.

Defendant said he was placed with his father in 1994 at his own request. The placement was revoked when his father complained to the probation officer about defendant's disobedience. The incident that led to his CYA commitment occurred when he and his cousin were involved in a high-speed car chase. His cousin had been driving. Defendant did not like being with gang members in the CYA. He preferred school and being kept in isolation, where he would read.

Defendant tried unsuccessfully to find work when he was paroled in November 1997. He did not have much of a relationship with his wife. They had married at her insistence, to legitimize their daughter. Regarding the incident with the prostitute, he claimed he had procured the gun for his companion, Murchinson, and it discharged accidentally during the attempted robbery.

Defendant denied that he planned or discussed killing Lora Sinner. He only decided to kill her after the assault, because he thought she was dying. He said Sinner was not tortured. He admitted cutting her wrist, but not pouring alcohol on the wounds. Though he felt he deserved to be imprisoned for his role in the murder, he conceded that he continuously made plans to escape. However, defendant maintained that he never meant to injure a guard. The plan for the final escape attempt had been to tackle Renault, restrain him in a cell, and use his key to get to an exterior window. He did not know Williams would attack Renault with the grate, which was supposed to be used to break the window. Defendant had

18

grabbed Renault, but walked away when he realized what Williams was doing. He regretted choosing the "unstable" Williams as a coconspirator.

Several mental health experts testified for the defense. Dr. Steven Blankman was the psychologist who reported the molestation by defendant's father. He assessed defendant in 1983 after his removal from the family home, and provided therapy for about a year. Defendant was uncooperative and oppositional. He displayed mild developmental problems with symptoms of insecurity, isolation, and impulsivity. He had experienced extreme psychosocial stress. By the time Blankman moved his practice, there had been little improvement. Defendant's behavior in temporary foster placement was disobedient, destructive, and aggressive. Blankman recommended continuing therapy and a permanent foster placement.

Dr. Myla Young, a clinical neuropsychologist specializing in inmate mental health, gave defendant a series of tests and reviewed his placement history. Young found defendant's intelligence to be "high average," but his performance on all measures of attention and concentration was significantly impaired. These results were consistent with his test scores in childhood. Defendant's performance on memory and learning tests was also poor. It would be reasonable to conclude that he suffered from brain damage. He exhibited a serious depressive disorder, grossly distorted perceptions of reality, and illogical thinking. He was emotionally dependent on others but his anger interfered with his ability to satisfy his emotional needs. Young found that defendant suffered from psychosis and posttraumatic stress.

Psychiatrist George Woods interviewed defendant three times for a total of six hours, and reviewed defendant's records. Woods also concluded that defendant suffered from posttraumatic stress disorder. His early childhood history had impaired his ability to self-regulate. Without appropriate behavioral control

19

and psychological treatment, his aggressive behavior had continued. He was traumatized again when his foster placements failed to provide stable family connections. His emotional responses tended to fluctuate between numbness and explosiveness. The symptoms of defendant's mental disorder were present at the time of the murder, but Woods said this did not mean defendant was not legally responsible for his actions.

### 3. *Rebuttal*

A social worker testified about the services defendant's family received in 1980. Based on her own observations at the time, she had concluded there was only general neglect in the household. More was required to merit court involvement.

A probation officer testified about numerous attempts to provide defendant with an appropriate setting. Defendant's juvenile placement officer in 1994 also spoke to the difficulties of securing a proper placement. Ken Sloan testified, admitting he had called defendant "son" and considered adopting him, but denying he promised to do so. Defendant had lived with Sloan from about the age of seven until he was twelve. His behavior deteriorated as he became older. Several CYA employees testified about defendant's conduct.

The prosecution called CYA psychologist Dr. Derek Washington, who had interviewed defendant in 1996 for an annual review. He had been surprised at defendant's hardened attitudes toward authority figures and rules, which were more typical of wards from metropolitan areas. Defendant was angry and embittered, but thought clearly. Washington saw no symptoms of organic brain disease, and concluded that defendant had an antisocial personality disorder. Psychiatrist John Shale reviewed defendant's records and the reports of the defense experts. He did not believe defendant suffered from depression or organic

20

brain disorder.  In his opinion, defendant had a severely antisocial personality rather than posttraumatic stress disorder.

### 4. *Surrebuttal*

Julie Kriegler, a psychologist who treated children with posttraumatic stress disorder, reviewed defendant's records and the other experts' reports.  She disputed Shale's findings, and agreed with the diagnoses of posttraumatic stress disorder.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Motion for Change of Venue*

##### a. *Background*

In October 2001, defendant moved to change venue from Shasta County. Defense expert Stephen Schoenthaler was a professor of criminal justice and a consultant on venue issues.  Schoenthaler reviewed local newspaper articles that appeared after defendant's arrest in April 1998.  He was particularly concerned about the report of defendant's confession.  Confessions are strongly linked with prejudgment of both guilt and penalty.  Schoenthaler also highlighted defendant's admission that he was using drugs and alcohol at the time of the murder, the newspaper's discussion of his criminal history, and stories portraying the victim in a sympathetic light.

Subsequent articles had addressed a variety of topics, including the prosecutor's decision to seek the death penalty, defendant's housing in administrative lockdown, Amy S.'s juvenile proceedings, and the following details.  A psychologist in the juvenile case described defendant as a "cult leader." Though married, he had seduced the fourteen year old shortly after her release from a psychiatric hospital and recruited her into his "Charles Manson-like lifestyle."  The juvenile court judge described defendant's manipulation and

21

seduction of Amy, and called him the most brutal participant in the killing. Amy's statement to the police referred to Sinner's "torture." Defendant threatened to kill Amy if she did not keep quiet. Defendant lied to police when he was arrested in a stolen car. The prosecutor in Amy's case said the murder had been planned for weeks, and was motivated by fear that Sinner would tell the authorities about the group's crimes. Amy was found guilty in the "torture death." The prosecutor in her case agreed with Sinner's father that the other participants should receive the death penalty. Lori Smith pleaded guilty to the "sadistic killing." Eric Rubio also pleaded guilty. Defendant threatened Lori because she agreed to testify against him.

The court authorized a community survey. Schoenthaler conducted telephone interviews with 131 Shasta County residents who qualified for jury service. Forty-nine percent of the respondents had concluded defendant was guilty. Fifty-two percent thought he deserved the death penalty if convicted. Fifty-six percent had prejudged either guilt or penalty. Schoenthaler believed there was "far more" than a reasonable likelihood that defendant would not receive a fair trial in Shasta County. The court was not persuaded, but acknowledged that a fair trial might prove to be impossible. It deferred ruling on the venue motion until after prospective jurors were questioned.

Voir dire began in May 2002. The court asked if prospective jurors had heard about certain aspects of the case.[4] If they remembered anything, the court

---

[4] The court inquired about the following subjects: Statements made by defendant to the police or the newspaper; one of the participants being a juvenile; charges found true in juvenile court; defendant's relationship with a 14 year old; statements by public officials about his culpability or the appropriate punishment; defendant's past behavior; the circumstances of the victim's life; any details involving a chili can, a dent puller, razor blades, washing in a creek, or pouring

*(footnote continued on next page)*

asked whether they had formed any feelings or opinions about defendant's guilt or the appropriate penalty. It probed whether they could set aside the impact of media reports and decide the case based solely on the evidence presented at trial. On June 22, 2002, defendant and Williams made the escape attempt in which Deputy Renault was assaulted and severely wounded. The next court day was June 25, 2002. Defense counsel were particularly concerned with two aspects of the latest publicity: Renault's status as a correctional officer, and defendant's association with Williams, who was notorious for having set fire to a synagogue in Sacramento and allegedly murdering a local gay couple.

The court agreed it was necessary to reopen the voir dire of the assembled juror pool to explore the effect of media accounts of the escape attempt. However, it refused to "ask them specifically how would you feel about this kind of evidence or that kind of evidence." It invited counsel to submit questions. Going forward with the voir dire of new candidates, it asked if they had seen or heard any media reports about defendant since filling out the questionnaire. If they knew about the escape attempt, it asked whether they would be able to set aside the information during deliberations. In some instances, the court inquired whether news reports had caused any feelings about defendant's guilt, and whether the prospective jurors would be able to set aside those feelings. The court barred counsel from asking about the weight they would give to evidence of the escape attempt.

On June 26, 2002, defense counsel submitted a list of questions for the reopened voir dire. The court said its questioning would depend on the

---

*(footnote continued from previous page)*

alcohol; the names Eric Rubio, Amy S., and Lori Smith; and admissions of guilt by two other charged persons.

prospective jurors' exposure to media reports. It rejected a proposed question asking how they would be affected by the fact that a correctional officer was the victim, because "that would be asking them to prejudge evidence." Defense counsel objected to this limitation, arguing that Deputy Renault's status as a correctional officer was "relevant to bias and prejudice." Counsel compared the circumstance to a case in which a child was a murder victim. The court recognized that evidence of the assault would be admissible in the penalty phase, but maintained that questions on the subject would lead to prejudgment. It requested further briefing on how the pending motion for a change of venue was affected by the incident.

Over the following two days, the court recalled the 73 prospective jurors who had been questioned before the escape attempt. It advised them collectively about media reports in general, warning that they were incomplete and often inaccurate. It noted that if evidence of reported events is introduced at trial the evidence, but not the reports, can be considered for the purposes allowed by law. The court then questioned the prospective jurors individually about their media exposure. If they were aware of the escape attempt, it sought their assurance that they would be able to set the reports aside in determining both guilt and penalty. The court continued to resist the defense's attempts to ask questions about the impact of the victim's status as a correctional officer. It did ask one prospective juror whether her father's employment as a jail deputy would have any effect on her evaluation of the case.

After completing the reopened voir dire, the court resumed questioning new prospective jurors, again asking specifically about their awareness of murder details and generally about the recent escape attempt. After ruling on challenges for cause, the court heard argument on the venue motion. The next day it denied the motion in a written ruling. Defendant sought a writ of mandate from the Court

24

of Appeal, arguing in part that even if prospective jurors were able to set aside the media reports of the escape attempt, there had been no voir dire exploring "the biases that unquestionably arise when there is an assault on a correctional officer, an escape attempt, or an attempted murder of a correctional officer." The writ was denied.

Defense counsel then moved unsuccessfully to disqualify the entire jury panel or to reopen voir dire, arguing that the court's questioning had been inadequate.

b. *Analysis*

Defendant argues first that the court erred by failing to grant a change of venue at the outset based on the Schoenthaler survey. However, "[t]his court has long held 'that it is no error for the trial court to postpone the consideration of an application for a change of venue until an attempt is made to impanel the jury . . . .' " (*People v. Bolin* (1998) 18 Cal.4th 297, 312, quoting *People v. Staples* (1906) 149 Cal. 405, 412; see *People v. Wallace* (1936) 6 Cal.2d 759, 763.) Here, the court performed a preliminary review but deferred a final ruling until after it heard challenges for cause. We review the court's final ruling.[5]

A motion for change of venue must be granted when "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033,

---

[5] Defendant relies on *People v. Beames* (2007) 40 Cal.4th 907. There, we said, "we do not suggest that trial courts may deny motions to change venue solely on the theory that jury voir dire is a better method of assessing the need to change venue." (*Id*. at p. 922.) However, here the court did not deny defendant's motion. It merely followed the established practice of deferring its ruling. Moreover, the comments in *Beames* on which defendant relies were dicta. In that case, Beames did not seek a change of venue, but only a continuance. (*Ibid*.) We did not discuss the long line of authority noted above, which approves the practice of postponing a ruling on a motion to change venue until an attempt is made to impanel a jury.

subd. (a); see *People v. Famalaro* (2011) 52 Cal.4th 1, 21.) "The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not," ' and 'something more than merely "possible. " ' [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 523 (*Proctor*).) The relevant factors are settled: the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, and the community status of the defendant and the victim. On appeal, the defense bears the burden of showing both error and prejudice. It must establish a reasonable likelihood both that a fair trial could not be had at the time of the motion, and that the defendant did not actually receive a fair trial. We accept the trial court's factual findings if supported by substantial evidence, but independently review the court's determination as to the likelihood of a fair trial. (*Famalaro*, at p. 21.)

Here, defendant does not dispute the court's finding that his community status and that of the victim did not tend to support a change of venue. He argues, however, that the gravity of the offense, the size of the community, and the extensive media coverage weighed heavily in favor of moving the trial.

As we have noted on other occasions, "every capital case presents a serious charge. This factor adds weight to a motion for change of venue, but is not dispositive. [Citations.]" (*Proctor*, *supra*, 4 Cal.4th at p. 524; see, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1125.) The court in this case reasonably concluded that the gravity of the offense slightly favored granting defendant's motion, but that the crime was not particularly aggravated in comparison with other capital murders. There were certainly gruesome details, but nothing approaching the sensational overtones of other cases in which we have upheld the denial of venue motions. (E.g., *Zambrano*, at pp. 1094-1097, 1125; *People v. Fauber* (1992) 2 Cal.4th 792, 818.) Nor were the circumstances of the crime apt to

26

be particularly prejudicial in Shasta County, as opposed to an alternate venue.  (Cf. *People v. Davis* (2009) 46 Cal.4th 539, 578.)

The population of Shasta County, which the court placed at about 168,000, was another factor weighing slightly in favor of defendant's motion.[6]  In *Proctor*, we said that Shasta County's small population, approximately 122,100 at the time, tended to favor a venue change, but was not determinative.  (*Proctor*, *supra*, 4 Cal.4th at pp. 525-526.)  So too here.  A change of venue is not required for every capital case arising in a sparsely populated county.  (*Id*. at p. 526.)

The primary factor relied on by the defense below was the nature and extent of media coverage, both of the murder and of the escape attempt.  However, as to the murder reports, the voir dire record supports the court's findings that "the prospective jurors, in general, had very little knowledge of specific facts of the crimes charged, very few opinions that the defendant is guilty, and very good compliance with the [court's] orders not to read, listen to, view, or talk about the charges in *this* case or anything connected with *this* case."  The court noted that media coverage had been heavy when the crime was discovered in April 1998, subsided until September 1998 when Amy S.'s jurisdictional hearing was held, and heightened again from April through July of the following year, with Amy's dispositional proceeding and the guilty pleas of Lori Smith and Eric Rubio.  Reports then "all but ceased in June of 2000," with little media attention as defendant's trial approached.[7]

---

**6**     Defense expert Schoenthaler derived a population of 163,000 from the United States census in 2000.
**7**     The venue motion was filed in October 2001; jury selection began in May 2002; the escape attempt was on June 22, 2002; the venue motion was denied on July 12, 2002; and trial began on July 16, 2002.

Defendant does not dispute the court's summary of the media coverage.  He argues, however, that five of the sitting jurors had been exposed to the facts of the murder.  The exposure was minor.  None of these jurors had any clearly formed memories, and several mentioned how long it had been since the news reports.  Prompted by the court for specific details, they remembered very few, and all said they had formed no preconceptions as to defendant's guilt or the appropriate punishment.[8]  Nothing in the voir dire suggests a reasonable likelihood that

---

[8]     Juror No. 1 "just barely" remembered the reports, "no details or no anything else."  Asked about specific aspects, he recalled none and said he had no preconceptions as to guilt or penalty.

     Juror No. 2 only "vaguely remember[ed]" reading something about the case, "because it was so long ago."  She said "the name rang a bell," but remembered none of the details mentioned by the court.  The information she did recall produced no opinion on guilt or punishment.

     Juror No. 5 wrote on her questionnaire that she remembered hearing four people were accused of killing a young girl; the victim was tortured; something about her father; two other females were involved; and, with a question mark, the victim had begged for mercy.  On voir dire, she said she remembered these things "vaguely," noting "it was a long time ago."  Of the details mentioned by the court, she remembered only something about the victim's father talking about his daughter and their family situation, and the chili can.  She said this information did not create any feelings about defendant's guilt or punishment.

     Juror No. 9 remembered having "heard something," but no details, commenting, "My memory ain't very good that long back."  Questioned by the court, she recalled generally that a juvenile was involved and that defendant may have had a relationship with her.  She remembered the chili can when the court mentioned it, and that it was somehow involved in the killing.  She had formed no impression regarding guilt or penalty.

     Juror No. 10 remembered hearing about where the murder happened, how the girl was beaten, and that "the kids were on drugs."  Prompted by the court, she remembered "maybe" that a juvenile was involved, that the victim was about ready to go back home, that a chili can and dent puller were used, and "maybe" that alcohol was poured.  She recognized the names of Eric Rubio, Amy S., and Lori Smith, but would not have been able to name them herself.  She had formed no

*(footnote continued on next page)*

defendant would not, or did not, receive a fair trial due to media reports of the facts of the crime.[9]

Defendant raises different arguments as to the publicity arising from his escape attempt. He makes no specific claim that reports of the escape prejudiced him on the question of guilt, though he generally maintains that the publicity denied him a fair trial. His primary argument is that he was deprived of a fair penalty trial because of the jurors' recent exposure to the news of his attempted escape from jail and the violent attack on Deputy Renault. Although defendant notes that seven of the sitting jurors had some knowledge of these incidents, he does not contend their voir dire responses demonstrate bias. Instead, he claims the court's limited questioning and its restrictions on counsel's voir dire made it impossible to determine whether these jurors were able to put aside their impressions or opinions and render a verdict based solely on the evidence. (*Irvin v. Dowd* (1961) 366 U.S. 717, 723; *People v. Davis*, *supra*, 46 Cal.4th at p. 575.) In particular, he contends his counsel were prevented from exploring whether the

---

*(footnote continued from previous page)*

opinion about guilt or punishment, and said she would be able to base her decision solely on the evidence presented in court.

[9] Defendant faults the court for deeming it a "moderating factor" that the local paper providing most of the coverage had a circulation of approximately 35,000, in a county with a population of around 168,000 and a jury pool of about 70,000. Schoenthaler testified that each newspaper is typically read by an average of 2.2 adults. However, we are satisfied by the court's careful and thorough voir dire that the jury pool was not tainted in any significant way by newspaper accounts of the charged offenses. Schoenthaler testified that he gave no weight to the six television broadcasts concerning the murder, because "I didn't think there was a lot there, frankly."

escape attempt and the assault on the deputy would cause the jurors invariably to vote for death.  (See *People v. Cash* (2002) 28 Cal.4th 703, 720-721.)

Because we reverse the penalty judgment on other grounds, we need not consider the question of penalty phase prejudice.[10]  As for the effect of these reports at the guilt phase, we are satisfied it was insignificant.  Evidence of the escape attempt was not admitted.  No jurors were exposed to extensive reports of the assault on Deputy Renault.[11]  Moreover, the court carefully ascertained

---

[10]     Nor do we consider defendant's claim that the court erroneously excused a prospective juror based on death penalty views expressed in her questionnaire, without any voir dire.  (See *People v. Russell* (2010) 50 Cal.4th 1228, 1261; *People v. Stewart* (2004) 33 Cal.4th 425, 445.)

[11]     Juror No. 1 saw a television broadcast and learned that an inmate had tricked a sheriff's officer and beaten him up.  He remembered the sheriff's office saying it was working on improving security to prevent another such episode.  However, he did not know the extent of the injuries inflicted, or who was involved.  He said the incident would not affect him as a juror because he did not know if it was related to the trial.  Asked if it would make any difference if it were, he said "no."

Juror No. 2 heard a radio report about two people in the jail, a sheriff's officer, and an incident involving a shower.  She did not remember any other details, except for Williams's name.  She was willing to set this information aside for purposes of trial, and disregard it if it were not in evidence.

Juror No. 4 heard a television broadcast about a deputy who had been beaten up, and saw defendant's picture.  He remembered hearing about a broken jaw, and was aware that Williams was involved.  He said he could set aside this information for purposes of trial.

Juror No. 5 saw a headline in the newspaper about a jail incident in which a deputy was injured, and photos of defendant and Williams.  She did not read the story, mindful of the court's admonitions to avoid news coverage.  She could set aside the information for purposes of the trial.

Juror No. 9 had heard a report on the morning news but "shut it off real quick."  She heard defendant's name and that someone was beaten up, maybe a correctional officer, and something about picking a jury.  She assured the court she could set aside this information and not consider it, and said it had not changed her feelings about the case.

*(footnote continued on next page)*

whether prospective jurors would be able to set aside whatever they had learned about the escape attempt and base their deliberations solely on the evidence at trial. "Although the jurors' assurances of impartiality are not dispositive [citations], neither are we free to ignore them [citations]. We have in the past relied on jurors' assurances that they could be impartial. [Citations.] Absent a showing that the pretrial publicity was so pervasive and damaging that we must presume prejudice [citations], we do the same here." (*People v. Lewis* (2008) 43 Cal.4th 415, 450.) Defendant has not shown that pretrial publicity of the escape attempt was "so pervasive and damaging" as to cast doubt on the jurors' assurances of impartiality. (*Ibid.*; see *Patton v. Yount* (1984) 467 U.S. 1025, 1031.)

Accordingly, defendant has failed to demonstrate a reasonable likelihood that the denial of a change of venue resulted in an unfair guilt trial. Although the gravity and nature of the murder, the relatively small size of Shasta County, and the publicity surrounding the crime are all factors tending to support a change of

---

*(footnote continued from previous page)*

Juror No. 10 saw headlines and defendant's picture, but closed the paper and had not listened to the news since. She knew that a guard had been attacked at the jail, and that Williams was involved. She was familiar with Williams. She said the fact that defendant and Williams were connected in the attack did not cause her any concern. She would be able to set aside what she saw in the newspaper.

Juror No. 12 heard a radio report about an incident at the jail. Her mother-in-law mentioned that defendant had hurt a guard, but the juror told her she did not want to hear anything else. She would be able to set aside this information.

The other jurors had not heard any news of the escape attempt. Defendant's claim that three sitting jurors received no admonition about the inaccuracy of media reports during voir dire following the escape attempt is baseless. At the record page he cites, the court told the assembled pool, "As you know, anything reported in the media is only reported in part and often not accurately."

venue, the record reflects a jury pool not predisposed against defendant on the question of guilt. Memories of media coverage of the murder had faded considerably by the time of trial. Nothing indicates that the renewed publicity occasioned by defendant's escape attempt resulted in any bias that might have affected the verdict of guilt.

### 2. *Imposition of Restraints*

On May 8, 2002, during pretrial proceedings, defense counsel objected to the placement of a stun device on defendant's arm, in addition to the leg brace the court had approved for security purposes. The brace locked the leg in an extended position, making it impossible to run. The court observed that the device on defendant's arm was visible, and that any stun device or visible restraint would require a showing of manifest need. The prosecutor referred to defendant's lengthy record of violence and recalcitrance in jail, and his plans to escape. A sergeant with the Shasta County Marshal's Office testified briefly about the security risk posed by defendant. The court continued the hearing to resume jury selection, and ordered the interim removal of the stun device.

On May 10, the court held a lengthy hearing on the issue of restraints. The sergeant returned to the stand. He recounted the incident in which defendant asked his wife to take pictures of the jail's exterior and told her he was planning to escape just before his trial began. The sergeant noted defendant's lengthy history of misconduct in custody, which resulted in the court's ordering him to be held in state prison for a period before trial. On the day he returned to county jail, defendant had tried to fight with a deputy and was subdued with pepper spray. Weapons had been discovered in his possession many times. In the courtroom he had access to pens, which could be used as a weapon. The sergeant asked that defendant be restrained with belly chains, leg irons, and handcuffs while in court.

A private investigator testified for the defense regarding his observations and understanding of defendant's conduct in custody. The court ruled that, in light of defendant's long history of nonconforming conduct in custody and his demonstrated interest in escaping, he would be restrained with the leg brace and a stun device on his leg. The court declined to impose any visible restraints.

A month later, defendant launched the escape attempt in which Deputy Renault was assaulted. Three days after that, the court held a hearing on the use of additional restraints. The marshal's office again asked for belly chains and leg irons. The court took testimony about the escape attempt and how the stun device worked. Defense counsel argued that the stun device was sufficient, making shackles unnecessary. In view of defendant's persistent misconduct in custody, and especially his recent escape attempt, the court approved the use of belly chains and leg irons. It ordered that paper be placed around the defense table so the jurors could not see beneath it.

On September 11, 2002, during the penalty phase, counsel reported that defendant was developing painful scabs on his ankles. A medical examination conducted the same day revealed minor lacerations over the Achilles tendon on both ankles. They were healing without sign of infection, and calluses were forming below them. The court reviewed the medical report the next day. Defense counsel asked that the leg irons be removed during the lunch break. The bailiff objected, noting that security in the court's holding facility was less comprehensive than in the jail, and emphasizing defendant's history of manufacturing weapons and attempting to escape. The request was denied.

Defendant concedes that the showing of manifest need for shackling was sufficient. (See *People v. Howard* (2010) 51 Cal.4th 15, 28.) Nevertheless, he claims shackling that causes pain and scarring is excessive and violates due process. Defendant cites no authority for the proposition that, even when the need

33

for shackling is manifest, the restraints must be removed if they cause discomfort or abrade the skin.  In any event, the record here shows only minor injuries, healing without complication.  No due process violation can be conjured from this scenario.  Defendant claims the shackles were visible to the jury, but the record does not support his assertion.[12]

Defendant argues briefly that the use of a stun device was unwarranted, citing *People v. Mar* (2002) 28 Cal.4th 1201.  There we held that stun belts, like shackles, may be justified by a showing of manifest need.  (*Id*. at pp. 1219-1220; see *People v. Duran* (1976) 16 Cal.3d 282, 290-293.)  Here, defense counsel conceded the stun device was appropriate, forfeiting the claim of error under *Mar*.  In any event, defendant does not challenge the court's finding of manifest need.  He fails to show any error in connection with the court's authorization of restraints in the courtroom.

---

[12]     The only record reference defendant provides is to an advisement given by the court during jury selection.  The prosecutor requested the admonition, after notifying the court that defense counsel had defendant stand up when the panel of potential jurors came in, at which point his leg and waist chains were visible.  Defense counsel said he was "deliberately not requesting" an advisement.  He thought it unnecessary until a jury was actually impaneled, but did not object to the prosecutor's request.

The court told the panel that security measures in the courtroom had nothing to do with the issues, and "so to the extent that you see certain security measures taken, which can include the number of bailiffs in the courtroom, the kinds of restraints that may or may not be placed on the defendant, those are issues not for your consideration, and you may not consider them in any way in reaching the determination that you're asked to make."  This general admonition, given by the court before leg irons were employed and before the jury was selected, reflects nothing about whether shackles were visible during trial.

B. *Guilt Phase Issues*

### 1. *Admission of Detective's "Opinion" Testimony*

During the prosecution's case-in-chief, Detective Ronald Clemens testified that defendant initially maintained his innocence but insisted he would take the blame for the murder. The jury watched a videotape of the interview. Afterward, the prosecutor noted that defendant seemed to be "breaking down and crying" at several points, and asked Clemens what he had observed. Defense counsel objected on grounds of irrelevance and undue prejudice. The court barred Clemens from giving an opinion based on the videotape, but allowed him to report his own observations during the interview. Clemens testified that when defendant appeared to be showing emotion, he "would always cover his eyes with his hand. And I didn't see any tears." Clemens said defendant's eyes and face were not red at these times.

Defendant claims the admission of this testimony violated his federal rights to due process and a fair trial. He first contends Clemens's observations were irrelevant to any issue relating to guilt. To the contrary, defendant's demeanor when discussing the crimes was relevant to help the jury determine his intent at the time of the events, his state of mind thereafter, and the credibility of his account. Defendant also argues that the testimony amounted to improper opinion evidence. Not so.[13] Clemens offered no opinion, but merely recounted his observations of defendant's actions and appearance. "[A] witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman*, *supra*, 38 Cal.4th at p. 397.) Nor was this brief testimony prejudicial;

---

[13] Defendant's claims about Clemens's "opinion testimony" are not only meritless, but also forfeited by the failure to object on that ground below. (*People v. Chatman* (2006) 38 Cal.4th 344, 397.)

35

it merely supplemented what the jury had seen on the videotape. (See *People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) Defendant offers a cursory argument that the prosecutor was also improperly permitted to ask Clemens, in connection with the interviews of Eric Rubio and Lori Smith, "Haven't we asked all of our witnesses to tell the truth?" However, Clemens expressed no opinion as to whether Eric and Lori were truthful in their statements. Defendant's arguments about opinion testimony are baseless.

2. *Admission of Statements by Defendant and Coperpetrators*

Defendant contends his federal due process rights were violated by the admission of various statements made by himself and his coperpetrators.

a. *Defendant's Statements*

Defendant sought to have a number of his statements to Detective Clemens redacted. The court agreed to some excisions, but defendant argues that certain remaining statements were prejudicial evidence of his bad character. We disagree.

In the first interview with Clemens, the following exchange occurred: "[Defendant]: I can't kill somebody like that. [Clemens]: Like what? [Defendant]: It's unmerciful. [Clemens]: You mean someone who can't protect themselves? [Defendant]: A lot of people that deserve to die, people who hurt other people." Defense counsel objected that the first and third of these statements were of little probative value, and were prejudicial because they indicated defendant could kill under other circumstances and was passing judgment on who should and should not die. The prosecutor contended the statements were probative with respect to defendant's knowledge of right from wrong, and were part of Clemens's efforts to catch him in a lie. The court overruled the objection.

Later in the same interview, Clemens suggested defendant had killed Sinner to keep her from reporting his criminal activity. Defendant said: "No I wouldn't kill nobody over that. I have specific set down reasons why I would kill

36

somebody, and I don't know why I killed her."  Counsel claimed this statement was inflammatory, prejudicial, and not probative.  The prosecutor argued that it went to defendant's state of mind and motive.  The court admitted the statement, finding it probative in connection with defendant's comment that he did not know why he killed Sinner.

The next statement was made in defendant's second interview, before he admitted his role in the killing.  Counsel objected to the italicized portion of the following comments:  "I wouldn't never abuse her, I wouldn't hit her, I give her whatever she asks for or wanted.  Same as I do any of my friends.  So she obviously trusted me, now she said something that one night, you know that you have to live with your whole life*, it's not killing somebody, I don't have a problem with that.  That's not what bothers me.*  The killing of her bothers me, killing somebody else doesn't bother me.  I don't glorify it, but I don't think it would bother me as much as this thing did."  The court rejected counsel's claim that these remarks were irrelevant and inflammatory, observing that defendant was explaining his mental state, intent, or feelings about the killing.

Later in the same interview, after he admitted killing Sinner, defendant said he knew she was going to die after he examined her wounds.  He added, "If I would have had a gun I would have just killed her faster, but I had no way to kill her faster.  . . . more than willing to do my time, it's a damn shame."  Clemens said, "Yes, it is."  Defendant commented, "First time in my life I haven't had a gun when I needed one, when it really counted."  Counsel argued that the latter statement was inflammatory, because it indicated the defendant had guns on other occasions.  The court disagreed, noting, "Sounds like a statement of intent."

Defendant contends all these statements were akin to evidence of prior bad conduct, which is inadmissible to prove criminal disposition under Evidence Code section 1101, subdivision (a).  He acknowledges that such evidence may be

admitted under subdivision (b) of section 1101 for certain purposes, such as to prove intent, motive, or identity. However, he claims that here his statements were admitted simply to prove his criminal disposition, and were so prejudicial they should have been excluded under Evidence Code section 352.

Defendant offers no authority supporting his analogy between his own admissions and evidence of other misconduct under Evidence Code section 1101. The prohibition on the use of "other crimes" evidence to prove character is not implicated here. Defendant's statements reflected his after-the-fact feelings about the charged killing itself. They were properly before the jury as statements of a party under Evidence Code section 1220, and probative on the issues of motive, intent, and consciousness of guilt. Nor were they unduly prejudicial. Any inflammatory impact they might have had was dwarfed by the horrific nature of the acts defendant admittedly performed. (Cf. *People v. Valdez* (2012) 55 Cal.4th 82, 134.) The statements were properly admitted.

b. *Coperpetrators' Statements*

Defendant challenges the admission of statements regarding "torture" made by coperpetrators Eric Rubio and Lori Smith. His briefing on this issue lacks sufficient record citations for a thorough review of his argument. "It is the duty of counsel to refer us to the portion of the record supporting [defendant's] contentions on appeal. [Citations.] . . . 'It is neither practical nor appropriate for us to comb the record on [defendant's] behalf.' " (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) We consider the record to which counsel does refer.

In his opening brief, defendant cites two pages of the transcript where the court and counsel discuss *defendant's* statements, only one of which includes a reference to torture. These citations do not support his claim with respect to statements by others. Defendant then cites a passage in the reporter's transcript

38

where the court resolved counsel's objection to a number of references to "torture" in a transcribed statement by Lori Smith. However, defendant fails to direct us to the clerk's transcript where those references appear in Lori's statement, nor does he discuss their context. Defendant also cites a reporter's transcript page on which the court refused to redact references to torture by Eric Rubio and, apparently, Amy S., again without citing to the transcribed statements themselves. Finally, the opening brief refers to pages where the court agreed to strike a torture reference by Eric.

In his reply brief, defendant cites two pages of a statement by Lori Smith, where the court struck two questions by the detective employing the word "torture" but not Lori's answer, "That was before . . . my brother started torturing her." The reply brief also refers to a comment by Lori that defendant "started torturing her, pretty much." However, no reference is made to an objection to the latter comment, and it appears none was made. Finally, the reply brief refers to a statement by Eric that defendant was "basically torturing" Sinner, but the court redacted this statement.

Thus, the only relevant statement properly presented for the trial court's consideration and documented in this court with record references is Lori's comment, "That was before . . . my brother started torturing her." In any event, defendant's arguments lack merit. He claims the coperpetrators' use of the term "torture," or their answers to questions using that term, amounted to improper lay opinion on the ultimate issue of whether defendant tortured Sinner, as alleged in the torture special circumstance. This argument was raised below and rejected. The court reasoned that while some questions about "torture" might seek to elicit an opinion, witnesses may also use the word in a purely descriptive sense to explain what they saw. In the latter situation, no improper opinion testimony is offered.

39

The court's reasoning was sound. Lori's statement about events before "my brother started torturing her" did not include an opinion about defendant's commission of a special circumstance. It was simply part of her narrative. A witness who uses the word "torture" in describing a sequence of events is no more testifying "in the form of an opinion" (Evid. Code, § 800) than a witness describing a "robbery." (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76-77.) It is conceivable that an investigator might solicit a witness's opinion on whether a particular act amounted to "torture" for purposes of the special circumstance. But here defendant identifies no questions or statements reflecting any such improper lay opinion. The jury was instructed that the torture special circumstance required a finding that defendant intended to and did "inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose." Defendant fails to show that any witness was invited to opine on whether this standard was met.

### 3. *Display of Enlarged Photographs*

On June 28, 2002, in advance of trial, the court and counsel reviewed a series of diagrams and photographs the prosecutor proposed to project onto a screen. The photographs were of the crime scene and the corpse. The projected images were approximately 6 feet wide and 4 feet high. Defense counsel objected that the prosecutor would have control over the size of the photographs when showing them at trial. The court said, "If I authorize something it's only going to be for whatever I see, and the size I say. And if there is a violation of that, then obviously that could be grounds for a mistrial." The court expressed concern about the emotional impact very large pictures might have on the jury.

The photographs were reviewed in sequence, but for unexplained reasons those designated People's exhibits 17 and 26 had not been loaded onto the prosecutor's compact disc. The prosecutor said he would give defense counsel a

40

copy of the disc he would use at trial. The defense did not object to photographs of the grave site before the corpse was fully unearthed, including two in which the upper part of the corpse was exposed. It did object to enlarged images of the corpse itself. The court sustained the objection, ruling that the magnified pictures of the corpse were "unduly prejudicial in terms of their emotional impact on the jurors."

At trial, on August 1, 2002, the prosecutor used the projector while questioning a  lieutenant about the crime scene investigation. Before showing any images, the prosecutor noted, "My recollection is that the body in the grave was not objected to." The court remembered that the objection was to autopsy photos. Defense counsel had no specific recollection but said, "I think it was not objected to." As the prosecutor went through the photographs with the lieutenant on the stand, he showed exhibits 17 and 26, which portrayed the corpse exposed in the grave from different angles, with a plastic bag wrapped around the head. No objection was made, but after displaying these pictures the prosecutor suggested taking a break. The court replied that it was 25 minutes until the next scheduled break. The prosecutor requested a bench conference and explained, "There are several jurors that are in a highly emotional state at this point, and I thought maybe a moment so that they could gather themselves." The court demurred, saying, "I don't think so."

The prosecutor then moved for admission of the exhibits used with this witness. The court asked if there were objections, and defense counsel objected to "the last" exhibits. The court deferred ruling until the next break. At that time, counsel objected to People's exhibits 10, 17, 26, and 27.[14] Counsel did not

---

[14]    Exhibit 10 showed the grave partially excavated, with some upper portions of the corpse exposed. During the pretrial review, defense counsel said he did not

*(footnote continued on next page)*

complain about the size of the projected photographs, or their omission from pretrial review. He argued that using this many photographs of the corpse was cumulative and prejudicial, and claimed it was obvious from the jury's reaction that the photographs were "having an impact." The court overruled the objection. Cocounsel then advised the court that defendant had told him some of the photographs shown by the prosecutor had not been shown in the pretrial review. Counsel asked only for an order that no further photographs be displayed unless defense counsel were given an opportunity to review them and make sure they were previously approved by the court. The prosecutor had no objection, and the court so directed.

The guilt phase concluded on August 28, 2002. On September 17, during the penalty phase, the defense moved for a mistrial on that ground that it was prosecutorial misconduct to display exhibits 17 and 26 without prior authorization. The prosecutor pointed out that before showing the photographs, he had notified the court and counsel of his recollection that no objection had been raised to photographs of the body in the grave. Defense counsel responded that the prosecutor had violated the court's directive regarding photographs that were not preapproved. The court denied the motion. It found no indication that any violation of its order was intentional, and no prosecutorial misconduct. The court also determined that defendant had not been prejudiced. If the photographs had been shown in advance, the court "certainly would have approved the use of at least one. The other was simply cumulative."

_____

*(footnote continued from previous page)*

have a problem with this photograph. The other three photographs were not included in the pretrial review.

42

On appeal, defendant renews his argument that the prosecutor violated the court's order not to use unapproved photographs. Defendant forfeited this claim by failing to promptly object at trial. To preserve a claim of prosecutorial misconduct, a defendant must make a *timely* and *specific* objection and ask the court for a curative instruction. (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Here, had a prompt objection been made, the photographs could have been removed from view and the jurors admonished. Defendant insists that he did object after all the photographs were shown, and that the court's overruling of the objection showed it would have been futile to object immediately. (See *Clark*, at p. 960.) However, when the court heard argument on the objection, counsel did not specifically raise the preapproval point, merely noting belatedly that some unspecified photographs had not been included in the pretrial review.

It was only when seeking a mistrial, as the penalty phase was underway, that the defense pointed out that exhibits 17 and 26 had not been approved by the court. Defendant does not claim the court erred by failing to grant a mistrial. He does, however, object to the court's finding that any violation of its order was unintentional, noting that prosecutorial misconduct need not be intentional. (*People v. Hill* (1998) 17 Cal.4th 800, 822-823.) The Attorney General responds on the merits of the mistrial ruling, arguing there was no misconduct because the exhibits in question were never ruled inadmissible, and there was no prejudice in any event.

Even if a claim associated with the projection of these photographs had been preserved and properly presented here, there was no error. The prosecutor's apparently inadvertent failure to secure pretrial review of these particular exhibits did not infect the trial with such unfairness as to make defendant's conviction a denial of due process. (*People v. Clark*, *supra*, 52 Cal.4th at p. 960 [federal standard for prosecutorial misconduct].) It did not amount to a deceptive or

reprehensible method of persuasion.  (*Ibid*. [state law standard for prosecutorial misconduct].)  Nor were defendant's chances of receiving a fair trial irreparably damaged.  (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [standard for grant of mistrial].)  Furthermore, given the overwhelming evidence of defendant's guilt, including his confession and the detailed testimony of three coperpetrators, any error would have been harmless under any standard of prejudice.

### 4. *Sufficiency of the Torture Evidence*

Defendant contends the evidence was insufficient to support the jury's finding of torture.  "The torture-murder special circumstance requires proof that a defendant intentionally performed acts that were calculated to cause extreme physical pain to the victim.  [Citation.]  Required is 'an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose.'  [Citation.]  We review the entire record, in the light most favorable to the prosecution, to determine whether a rational trier of fact could have found the essential elements of the torture-murder special-circumstance allegation beyond a reasonable doubt.  [Citations.]"  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1136 (*Mungia*).)  "A premeditated intent to inflict prolonged pain is not required."  (*People v. Elliot* (2005) 37 Cal.4th 453, 479.)

The intent to torture "is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds."  (*People v. Crittenden* (1994) 9 Cal.4th 83, 141.)

Defendant claims the evidence showed no attempt on his part to increase the victim's suffering or inflict pain in addition to the pain of death.  He compares this case to *Mungia*, where evidence of a savage beating did not suggest an attempt

44

to torture the victim rather than simply to kill her.  (*Mungia*, *supra*, 44 Cal.4th at p. 1137.)  The comparison is inapt.  Here, by his own admission, defendant told Sinner she was going to kill herself, and forced her to cut her own wrist.  He then cut her wrist himself and poured whiskey over the wounds several times, despite the obvious pain this caused.  He also kicked Sinner and struck her with the metal bar when she moved her hands away from the fire pit.  His claim that he was only trying to ease the way to an inevitable death is undermined by the sadism demonstrated by his conduct.  The evidence of torture was sufficient.

### 5. *Constitutionality of the Torture Special Circumstance*

Defendant claims the torture special circumstance fails to perform the constitutionally required narrowing function meant to avoid arbitrary imposition of the death penalty, and therefore violates the Eighth and Fourteenth Amendments. We have rejected this argument on a number of occasions.  (E.g., *People v. Whisenhunt* (2008) 44 Cal.4th 174, 223; *People v. Barnett* (1998) 17 Cal.4th 1044, 1160-1163; *People v. Raley* (1992) 2 Cal.4th 870, 898-900 (*Raley*).)  Defendant argues that the phrase "for any sadistic purpose" in the instruction given to his jury is vague and overbroad.[15]  He notes that in *Raley*, we quoted dictionary definitions focusing on a sexual element in sadism.  (*Raley*, at p. 900.)  Defendant contends there was no evidence of sexual motivation in this case, and therefore no sadism. Insofar as defendant suggests the "sadistic purpose" element of the special circumstance is too *narrow* to apply here, his claim of overbreadth is misplaced. In any event, our discussion in *Raley* was not so limited.

---

[15]    The jury heard CALJIC No. 8.81.18, which included the following element: "The defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose."

*Raley* held there was no need to instruct the jury on the meaning of "sadistic purpose" because the phrase is one "in common usage, having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure." (*Raley*, *supra*, 2 Cal.4th at p. 901.) Although sadism is commonly associated with sexual pleasure, courts have recognized that it does not necessarily have a sexual motivation. (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1203; *People v. Healy* (1993) 14 Cal.App.4th 1137, 1142.) Defendant fails to undermine our settled view on the constitutional sufficiency of the torture special circumstance.

C. *Exclusion of Evidence About Prison Conditions at the Penalty Phase*

1. *Background*

In his opening statement at the penalty phase, defense counsel told the jury that James Park, a former associate warden at San Quentin State Prison, would testify about the security conditions imposed on prisoners sentenced to life without parole. Park would explain that such prisoners are watched at all times by an armed guard from a secure location, and that no guard enters prisoner areas unless accompanied by another guard. Prisoners who behave dangerously are placed in solitary confinement and locked down for all but short periods of time. Counsel also said Park would opine that defendant would adjust to prison life.

The prosecutor filed a motion to exclude Park's testimony. He cited *People v. Quartermain* (1997) 16 Cal.4th 600, 632, for the proposition that "evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense."

At the hearing on the motion, defense counsel argued that Park's evidence was admissible for two separate purposes. First, counsel wanted to inform the jury

46

about what he described as "for lack of a better term, the day in the life of a person in prison." The second and principal purpose for Park's testimony was to rebut the prosecution's evidence of defendant's violent jail conduct and escape attempts, which raised the issue of his future dangerousness in prison. Park would explain that because state prison facilities were more secure than county jail, defendant would not have the same opportunities for assault and escape. Counsel referred to the holding of *Skipper v. South Carolina* (1986) 476 U.S. 1, 5 (*Skipper*): "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating" and thus "may not be excluded from the sentencer's consideration." Counsel also relied on *People v. Fudge* (1994) 7 Cal.4th 1075, 1117 (*Fudge*), where this court found *Skipper* error in the exclusion of expert testimony that the defendant was "a likely candidate to lead a productive and nonviolent life in prison."

The prosecutor responded that he was precluded from arguing defendant's future dangerousness unless defendant introduced evidence on the subject. The court disagreed. It said, "You can certainly argue future dangerousness based upon [defendant's] conduct," and advised the prosecutor to "look at the cases." Defense counsel observed that even if the prosecutor did not explicitly argue future dangerousness, the jury would draw the inference itself. He noted that in *People v. Lucero* (1988) 44 Cal.3d 1006 (*Lucero*), this court held it was reversible error to bar a defense expert from testifying that the defendant would be unlikely to commit future crimes, and would adjust to the structured setting of prison life. (*Id.* at pp. 1026-1028.)

After reviewing the authorities submitted by counsel, the court prefaced its ruling on the motion by quoting *People v. Welch* (1999) 20 Cal.4th 701, 761: " '[I]t is settled that argument concerning a defendant's future dangerousness as a life prisoner is proper when it is based on evidence of past crimes admitted under

47

one or more statutory factors in aggravation.' " "Keeping that in mind," the court ruled that evidence of "what it's like to be in prison" was inadmissible, including evidence of security measures in state prison. The court reasoned that this evidence had no relevance to the issues of defendant's character, culpability, or the circumstances of the offense, or to any statutory aggravating or mitigating circumstance. Therefore, it "sustain[ed] the People's objection to the presentation of that witness."

In his penalty phase closing argument, the prosecutor emphasized defendant's persistent escape attempts and his threatening and violent behavior toward correctional officers. He argued at length that the evidence showed defendant had personally inflicted Deputy Renault's injuries. The prosecutor mentioned the prospect of future dangerousness, asserting that "defendant has shown himself to be violent and dangerous in every setting, and he will continue to be so now, and into the future." He claimed defendant's attacks on guards reflected his antisocial personality disorder, and said, "He's going to get worse. We've seen that escalating. Escalating."

During deliberations, the jury sent out a note: "A question has arisen as to what can be considered as an aggravating factor. We know that anything can be considered as a mitigating factor, as specified by item K. Are we required, however, to only consider items A & B & C as aggravating factors? In particular, the possibility of future escapes and/or violent crimes is a factor weighing on several jurors' minds. This is not a specified aggravating factor, but can we consider it?"

The court consulted with counsel. Defense counsel argued that the jury should be told simply to confine its deliberations to factors (a), (b), and (c) of section 190.3. He noted the defense had been barred from presenting Park's testimony "on the issue of security and adjustment to prison." Because defendant

48

had not been allowed to show that prison would be a safe place from which he could not escape, counsel said the jury should not consider "future escape attempts." The prosecutor disagreed, claiming the defense "could have [had] testimony to that fact that they can't get out of jail." He argued that the relevant consideration was not escape, but "the threat of harm to jailers from escape attempts." The court agreed this threat was a proper inference to be drawn from the aggravating evidence.

Accordingly, the court told the jury that "yes," its deliberations were limited to factors (a), (b), and (c) of section 190.3. Answering the question about future dangerousness, the court said: "The prediction of future dangerousness is not a type of evidence jurors can consider in determining penalty. However, inferences that a defendant will remain a danger to others in the future, or escape in the future, which are drawn from evidence of defendant's past conduct may be considered by a juror for whatever value the juror assigns to such inferences in determining penalty."

2. *Analysis*

Defendant contends the exclusion of Park's testimony violated his federal constitutional rights to due process, a fair trial, and a reliable sentencing determination. He claims he was entitled under *Skipper* and *Fudge* to present testimony that he would adjust well as a life prisoner. Defendant further argues that he was denied the right to rebut the prosecution's evidence of his conduct in custody by presenting evidence of prison security measures. We agree that the exclusion of Park's testimony was a violation of due process, because it deprived

49

defendant of the opportunity to counter aggravating evidence and argument suggesting that he would be a dangerous life prisoner.[16]

As a general rule, evidence of prison conditions is not admissible at a penalty trial. "[W]e have repeatedly held that evidence concerning conditions of confinement for a person serving a sentence of life without possibility of parole is not relevant to the penalty determination because it has no bearing on the defendant's character, culpability, or the circumstances of the offense under either the federal Constitution or section 190.3, factor (k). (*People v. Jones* (2003) 29 Cal.4th 1229, 1261, citing *People v. Quartermain* (1997) 16 Cal.4th 600, 632;

---

[16] Defendant correctly contends he had the right to present Park's opinion that he would adjust to life in prison. (*Skipper*, *supra*, 476 U.S. at p. 5; *People v. Ervine* (2009) 47 Cal.4th 745, 795; *Lucero*, *supra*, 44 Cal.3d at pp. 1026-1029; *Fudge*, *supra*, 7 Cal.4th at p. 1117.) However, counsel did not argue this ground at the hearing on the motion to exclude Park's testimony. Although he briefly mentioned in his opening statement that Park would give an opinion that defendant "will adjust to prison life," he made no mention of the subject at the hearing. Counsel cited *Skipper*, *Fudge*, and *Lucero*, but did not say that Park should be allowed to offer opinion testimony on defendant's ability to make a successful transition to life in custody. Nor did the defense make an offer of proof to establish the extent and basis of Park's testimony. (Compare *Fudge*, at pp. 1113-1114.)

Given our conclusion on the exclusion of Park's testimony about security measures, we need not consider defendant's argument on the subject of adjustment to prison life, even assuming that claim of error was preserved. (See Evid. Code, § 354, subd. (a) [error in exclusion of evidence is not reversible unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"]; *People v. Lightsey* (2012) 54 Cal.4th 668, 727 [abuse of discretion in sustaining objection could not be found when defendant made no offer of proof as to why witness should have been permitted to answer]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1178 [defendant bears burden of establishing foundation for mitigating evidence]; *People v. Whitt* (1990) 51 Cal.3d 620, 647-649 [claim of *Skipper* error was not preserved when defendant failed to establish pertinence of testimony].)

*People v. Daniels* (1991) 52 Cal.3d 815, 876–878; *People v. Thompson* (1988) 45 Cal.3d 86, 138–139.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 963; accord, *People v. Ervine*, *supra*, 47 Cal.4th at pp. 794-795.) Thus, the court properly rejected the defense's attempt to have Park provide a generic account of the daily routines of life prisoners.

However, the general rule does not dispose of defendant's claim that he was entitled to present evidence of prison security measures to *rebut* the prosecution's assertion that he would pose a danger in custody. Our cases holding that evidence of prison conditions is inadmissible have not addressed this kind of rebuttal evidence.[17] The right to rebut aggravating evidence in capital cases is settled, and of constitutional dimension. The United States Supreme Court has articulated the governing principle in cases where the defendant's future dangerousness is a factor. "[W]here the prosecution relies on a prediction of future dangerousness in requesting the death penalty, elemental due process principles operate to require admission of the defendant's relevant evidence in rebuttal." (*Simmons v. South Carolina* (1994) 512 U.S. 154, 164 (plur. opn. of Blackmun, J.) (*Simmons*).)

Justice Blackmun's opinion in *Simmons* was signed by only three other justices, but Justice O'Connor's concurrence, joined by two others, established a

---

[17] See *People v. Martinez*, *supra*, 47 Cal.4th at page 962 (prosecutor disclaimed reliance on future dangerousness); *People v. Ervine*, *supra*, 47 Cal.4th at pages 795-796 (prosecutor refrained from arguing inference of future dangerousness); *People v. Jones*, *supra*, 29 Cal.4th at pages 1260-1261 (prosecutor's exploration of prison incidents occurred on cross-examination of defense expert); *People v. Quartermain*, *supra*, 16 Cal.4th at page 634 (prosecutor's brief argument was confined to evidence in mitigation); *People v. Daniels*, *supra*, 52 Cal.3d at page 877 (paraplegic defendant sought to show conditions he would face in prison); *People v. Thompson*, *supra*, 45 Cal.3d at pages 138-139 (evidence of prison conditions offered to dispel idea that life sentence would be "lenient").

51

clear majority for the proposition that " '[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, . . . the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain" [requires that the defendant be afforded an opportunity to introduce evidence on this point].' " (*Simmons*, *supra*, 512 U.S. at p. 175 (conc. opn. of O'Connor, J.), original brackets, quoting *Skipper*, *supra*, 476 U.S. at p. 5, fn. 1; see *Gardner v. Florida* (1977) 430 U.S. 349, 362. See also *Kelly v. South Carolina* (2002) 534 U.S. 246, 248 [*Simmons* rule]; *O'Dell v. Netherland* (1997) 521 U.S. 151, 159 [same].) We have recognized that under *Skipper* and *Gardner*, "[w]hen a defendant is precluded from introducing evidence rebutting the prosecution's argument in support of the death penalty, fundamental notions of due process are implicated." (*People v. Frye* (1998) 18 Cal.4th 894, 1017.)

Here, defendant sought to counter the potent evidence of his persistently dangerous conduct in custody by informing the jury about security measures imposed on life prisoners. The prosecutor succeeded in keeping that information from the jury. As a result, the impact of the aggravating evidence was significantly enhanced. Such an unfair advantage on the critical question of penalty offends the fundamental principles of due process set out in *Simmons* and *Skipper*. This conclusion does not mean that evidence of prison security measures is relevant in every capital case. It remains the rule that "day in the life" evidence is inadmissible. (*People v. Martinez*, *supra*, 47 Cal.4th at p. 962.) When, however, the prosecution raises an inference of future dangerous conduct in prison as part of its case in aggravation, the defendant is entitled to respond with evidence that his chances to inflict harm in prison will be limited. The prosecution is of course free to explore the extent of that limitation on cross-examination, and to counter with evidence that life prisoners have opportunities for violence.

Our reasons for excluding evidence of prison conditions in earlier cases do not apply to defense attempts to rebut a showing that reflects future dangerousness. The primary rationale, and the one followed by the court below, has been that prison conditions are irrelevant to any aspect of the defendant's character, culpability, or the circumstances of the offense. (E.g., *People v. Martinez*, *supra*, 47 Cal.4th at p. 963; *People v. Quartermain*, *supra*, 16 Cal.4th at p. 632; *People v. Thompson*, *supra*, 45 Cal.3d at p. 139.) That is why the defense may not introduce such evidence as a factor *in mitigation*. The defense may, however, respond to aggravating evidence suggesting the defendant will be dangerous in prison. Ineligibility for parole is also unrelated to a defendant's character, culpability, and criminal offense, but it is nevertheless "indisputably relevant" when the prosecution raises the issue of the defendant's future dangerousness in the community. (*Simmons*, *supra*, 512 U.S. at p. 163 (plur. opn. of Blackmun, J.); see *id*. at pp. 176-177 (conc. opn. of O'Connor, J.).) Similarly, security measures aimed at restraining a defendant from acting on the violent impulses demonstrated by the aggravating evidence, or preventing him from inflicting harm, are relevant when the prosecution suggests that the defendant's violent conduct will continue in custody.

We have also noted that testimony about future conditions of confinement involves speculation as to what future officials in another branch of government will or will not do. This observation was first made in *People v. Thompson*, *supra*, 45 Cal.3d at page 139, where the defendant sought to provide a general picture of prison life in order to persuade the jury that a life sentence is not lenient punishment. (*Id*. at p. 138; see *People v. Rundle* (2008) 43 Cal.4th 76, 186-187.) We have repeated *Thompson*'s criticism of " 'speculation,' " however, in cases where the defense offered more narrowly focused testimony on prison security

measures. (*People v. Martinez, supra*, 47 Cal.4th at p. 963; *People v. Jones*, *supra*, 29 Cal.4th at p. 1261.)

When the defense seeks to rebut an inference of future dangerousness in custody, *Thompson*'s reasoning is inapposite. The purpose of informing the jury about security conditions in such a case is to *prevent* speculation by the jury about the defendant's opportunities to inflict harm in the prison setting. (Cf. *Simmons*, *supra*, 512 U.S. at pp. 165-166 (plur. opn. of Blackmun, J.).) Expert testimony on prison security need not involve undue speculation about specific measures that might or might not be imposed by penal authorities in the future. Testimony explaining security policies followed in California prisons with respect to prisoners sentenced to life without parole, from an expert familiar with the penal system, is sufficiently reliable to be considered in connection with inferences of future dangerousness drawn from a defendant's past violent conduct in custody.

The Attorney General contends this case is controlled by *People v. Martinez, supra*, 47 Cal.4th 911. There, however, the prosecutor offered no evidence of future dangerousness. (*Id*. at p. 962.) Furthermore, the court did not bar the defense expert from testifying about prison conditions. Rather, it limited his testimony, ruling that detailed evidence of prison operations and exhibits depicting prison facilities and safety measures was inadmissible, but allowing the expert to give " 'general descriptions of prison life' as well as his opinions on defendant's future dangerousness and whether prison life was the kind of structured environment that defendant needed. . . . The court also made clear that it would allow [the expert] to describe the level 4 [maximum security] classification and its subdividing classifications." (*Ibid*.) We rejected Martinez's claim that the limitations imposed by the court were improper. (*Id*. at p. 963.) Here, the court did not issue a narrow ruling like that in *Martinez*, which permitted the expert to offer his opinions in some areas. The prosecutor sought to exclude

Park's testimony in its entirety, and the court granted the motion without qualification.

Accordingly, defendant was deprived of his due process right to rebut the prosecutor's evidence and argument suggesting that he would be a dangerous life prisoner. "[O]ne of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him." (*Simmons*, *supra*, 512 U.S. at p. 175 (conc. opn. of O'Connor, J.).) The error is reversible unless it is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Frye*, *supra*, 18 Cal.4th at p. 1017; *Fudge*, *supra*, 7 Cal.4th at p. 1117.) We conclude there is reasonable doubt as to whether the jury would have returned a verdict of death had the defense been allowed to present Park's testimony.

The evidence of defendant's violence in jail and his persistence in making escape attempts was dramatic and compelling. The jury's concern about his future dangerousness was reflected in its note to the court asking whether his jail conduct could be considered. Furthermore, defendant's showing in mitigation was substantial. Numerous witnesses detailed his difficult life as a child, including prolonged molestation at a very young age by his father. In his subsequent journey through multiple placements in the social services system, defendant encountered further physical abuse and repeated disappointment in his hopes of finding a stable family environment. Medical experts testified about the effects of these experiences on his development. In weighing the mitigating and aggravating factors, some jurors may have felt that defendant had been damaged through no fault of his own, but had become so dangerous even in penal custody that death was the appropriate verdict. We express no view on the appropriate penalty, but we must consider how a jury that heard the excluded evidence might have responded differently. We cannot say there is no reasonable doubt that the

55

outcome of the penalty trial would have been the same had Park been allowed to testify.

Having reached this conclusion, we need not address defendant's claim that his counsel were ineffective for promising to present Park's testimony in the opening statement before securing a ruling from the court on its admissibility. Nor is it necessary to address the other penalty phase issues defendant raises.

## III. DISPOSITION

We affirm the judgment of guilt, and reverse the judgment of death.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Smith

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S112442
**Date Filed:** April 27, 2015

_____

**Court:** Superior
**County:** Shasta
**Judge:** James Ruggiero

_____

**Counsel:**

Kathy Moreno, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Eric L. Christoffersen and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathy Moreno
P.O. Box 9006
Berkeley, CA 94709
(510) 649-8602

Angelo S. Edralin
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 445-9909