Filed 3/20/24  P. v. Ramirez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080498 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN421603) |
| RICHARD JACK RAMIREZ, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Benjamin Boyce Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal, Randall Einhorn and Andrew Scott Mestman, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Richard Jack Ramirez, Jr., of first degree murder. (Pen. Code,[1] § 187, subd. (a).)  It found true an allegation that he personally

---

[1]     Undesignated statutory references are to the Penal Code.

used a knife.  (§ 12022, subd. (b)(1).)  In a bifurcated proceeding, Ramirez admitted he suffered three prior strike convictions and two prior serious or violent felony convictions under the "Three Strikes" law.  (§§ 667, subds. (a)(1), (b), 668, 1170.12, subds (b), (c)(1), 1192.7, subd. (c).)  The court sentenced Ramirez to 75 years to life for the murder, plus a one year enhancement for the knife-use allegation.

Ramirez contends:  (1) The court erroneously admitted evidence of his demeanor after the incident; (2) the prosecutor committed several acts of misconduct; (3) the court erroneously failed to provide the jury a unanimity instruction; (4) there was cumulative error; and (5) the court applied the wrong standard to evaluate his posttrial motion to reduce the first degree murder conviction to voluntary manslaughter or second degree murder.  We affirm.

FACTUAL AND PROCEDURAL SUMMARY

On February 5, 2021, a motorist was stopped at an intersection in Oceanside.  She saw the driver of a pickup truck, later identified as J.R., slowly roll back into Ramirez's pickup truck.  Ramirez appeared angry, quickly exited his truck, and banged on J.R.'s window.  J.R. drove off quickly. Ramirez got in his truck and followed J.R.

J.R. testified that he drove down the street and made two U-turns in an effort to "shake [Ramirez] off."  Eventually, J.R. parked across the street from his house, and Ramirez parked behind him.  J.R. exited his truck and Ralph Hermosillo, a worker of J.R.'s, approached.  An altercation ensued between Hermosillo and Ramirez.  Referring to J.R., Hermosillo told Ramirez something like, "That's my uncle," even though it was not true.  J.R. did not observe a machete or anything in Hermosillo's hands.  Hermosillo pointed out that Ramirez's vehicle was not damaged, and directed Ramirez to the back of

2

it.  Shortly afterwards, J.R. saw Ramirez turn his hat backwards, and he heard a "thump."  Hermosillo fell to the ground, and Ramirez kicked Hermosillo in the head.  Ramirez returned to his truck and drove off.

Both J.R.'s neighbor and a visitor to the neighborhood witnessed a portion of the altercation.  They testified Hermosillo had no machete or other weapon in his hands, and they saw none near his body following the incident.  Responding to a 911 call, police arrived at the scene, where Hermosillo died within minutes.

The medical examiner conducted an autopsy on Hermosillo and testified his cause of death was a stab wound to his neck and blunt force injury to his head.  He stated Hermosillo's stab wound appeared to be inflicted by a double-edged knife.  Hermosillo's blood tested positive for what the medical examiner stated was a "very high" level of methamphetamine.

Although they were not married, a woman identified at trial as Ramirez's "wife," O.C., testified she accompanied him in the vehicle that day.  After the collision, they pursued J.R. to his house.  There, Ramirez approached J.R.'s vehicle and told him, "Hey dude, all you had to do was pull over.  All we need is your insurance."  Then, "out of nowhere," Hermosillo came from across the street holding a machete and "bouncing on his toes."  Hermosillo asked Ramirez, "You have a fucking problem with my uncle?"  Ramirez stepped back and replied, "Hey dude, your uncle just hit my fucking truck."  As Hermosillo approached him, Ramirez ended up at the back of his truck.  O.C. heard a "smacking" noise and, "out of the corner of [her] eye," saw Hermosillo fall to the ground.  Ramirez kicked Hermosillo.  As they were driving away, she looked in the vehicle's rear view mirror and saw J.R. throwing a machete into the back of his truck.

O.C. testified at trial: "I have training. I'm a surgical tech. I know what to do. I didn't know [Hermosillo] was stabbed. I would have applied pressure. I would have given CPR."

On the night of the incident, an Oceanside police officer interviewed O.C., and a recording of the interview was played for the jury. O.C. told the officer that following the incident, she told Ramirez, "[Y]ou guys didn't have to fucking fight. You could have just fucking told the dude to fuck off and we could have left." Ramirez responded, "I'm a muthafuckin man."

On cross-examination, O.C. confirmed she telephoned Ramirez in jail on the night of the preliminary hearing and told him: "Well, I'm here for the fucking long run. So I just fucking go with it, whatever you want to do. That's—you know, I got you. I got your back regardless. You do what you want. You're a fucking smart man."

A police officer arrested Ramirez on the night of the incident. He recovered a pocketknife from him, but did not yet know about the stabbing. The officer put the knife in the back of Ramirez's truck, which was impounded and towed away. The knife was never recovered.

Ramirez testified at trial and admitted stabbing Hermosillo in the neck with a multi-tool instrument called a Leatherman, which was compared to a Swiss Army knife. Ramirez said that at the start of the altercation, his wife told him, "Babe, he's got a machete." Ramirez saw Hermosillo making threatening moves with the machete. Ramirez told Hermosillo to put the machete down, but he swung at Ramirez. Fearing for his life, Ramirez stabbed him in self-defense. Ramirez also admitted kicking Hermosillo in the head afterwards. When asked why he did that, he replied, "To make sure, you know, that he's stopped." Ramirez did not tell his wife he had stabbed Hermosillo because "she stresses a lot." Ramirez conceded that a

4

Leatherman does not have a double edge, and the medical examiner testified that Hermosillo was stabbed with a double-edged blade.

On cross-examination, the prosecutor asked Ramirez about the circumstances surrounding his arrest. Specifically, when the police officer asked him separate questions about the collision and the stabbing incident, Ramirez twice responded, "I don't know nothing." Ramirez admitted that he had lied to the officer both times.

In rebuttal, the prosecution played a portion of a video of Ramirez's police interview. The prosecutor asked the interviewing officer if Ramirez's demeanor remained the same "throughout that evening." The officer replied, "Yes, it was like what we saw in the video there. He was just apathetic and indifferent to what I had to say, really."

DISCUSSION

I. *Evidence of Ramirez's Demeanor*

Ramirez contends the court erroneously admitted irrelevant and prejudicial evidence of his demeanor to show his lack of remorse. He contends, "[T]he prosecutor's assumption that [he] should behave one way if the stabbing was justified by self-defense, and some other way if it was unprovoked, was entirely speculative." He argues the prosecutor "used the evidence to disparage [him] and belittle his defense. . . . These error [*sic*] rendered [his] trial fundamentally unfair." Ramirez additionally contends the error was not harmless, as the evidence in this case was "weak" and absent the demeanor evidence, "there is a reasonable probability that at least one juror would have voted not guilty."

A. *Background*

The prosecution moved in limine to admit videotape evidence showing that after he was given his rights under *Miranda v. Arizona* (1966) 384 U.S.

5

436, Ramirez told the police officer that he did not know anything about the incident with Hermosillo. The prosecutor also sought to admit a video recording showing Ramirez's demeanor during his detention. The court denied the motion, concluding that evidence was cumulative; however, it allowed that if Ramirez testified, the demeanor evidence could be admissible for impeachment.

At trial, the prosecutor asked Ramirez regarding his interaction with police after they detained him: "You didn't have a care in the world that you just killed somebody?" Next, pointing out that Ramirez fell asleep at the police station, the prosecutor asked him, "You then began snoring like a baby?" The prosecutor again asked Ramirez, "Did you have a care in the world? The court sustained defense objections to each of those questions.

During closing arguments, the prosecutor drew no objection when he mentioned Ramirez's demeanor during the police interview: "Then we have the defendant's interview. Look at—watch that again. Look at his demeanor. Listen to his tone. Listen to what he says: 'I don't know nothing,' right? . . . He has no remorse at all for stabbing another human being in the neck. Even if it was justified, is this how you're going to act? And then right afterwards they strip you down, you're wearing a trash bag, and you just lay down and go to sleep like nothing ever happened, snoring like a baby? Give me a break. Okay. So that's how we know self-defense is not at issue."

B. *Applicable Law*

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) Generally, we will not disturb the exercise of its discretion unless it acted arbitrarily, capriciously, or in a patently absurd manner. (*People v. Williams* (2008) 43 Cal.4th 584, 634.)

6

To be relevant, the evidence must have "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Although generally all relevant evidence is admissible (Evid. Code, § 351), the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905.) "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

" ' "In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 905.) Rather, this prejudice refers to " ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*Ibid.*) " 'In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

"Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818 . . . , which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 576.) "However, when the error involves a defendant's federal constitutional rights . . . , the error is reviewed for prejudice under the

7

standard described in *Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)]," which asks a reviewing court to evaluate whether it can say beyond a reasonable doubt that the erroneous admission of evidence did not contribute to the jury's guilty verdict. (*Roberts*, at pp. 576-577.)

The California Supreme Court addressed the relevance of demeanor evidence in *People v. Smith* (2015) 61 Cal.4th 18. In that case, a detective testified that the defendant initially maintained his innocence but insisted he would take the blame for the murder. The jury watched a videotape of the defendant's police interview. Afterward, the prosecutor noted that defendant seemed to be " 'breaking down and crying' " at several points, and asked the detective what he had observed. (*Id.* at p. 45.) Defense counsel objected on grounds of irrelevance and undue prejudice. The trial court barred the detective from giving an opinion based on the videotape, but allowed him to report his own observations during the interview. The detective testified that when the defendant appeared to be showing emotion, he " 'would always cover his eyes with his hand. And I didn't see any tears.' " (*Id.* at p. 46.) Defendant on appeal claimed the admission of this testimony violated his federal rights to due process and a fair trial, and that the detective's observations were irrelevant to any issue relating to guilt. The California Supreme Court ruled, "To the contrary, defendant's demeanor when discussing the crimes was relevant to help the jury determine his intent at the time of the events, his state of mind thereafter, and the credibility of his account." (*Id.* at p. 46.)

C. *Analysis*

The court carefully circumscribed the evidence of Ramirez's demeanor during his initial interrogation, sustaining defense objections to a series of the prosecutor's questions. The jury was able to observe his demeanor first

hand when it reviewed the videotaped interview. To the extent the court permitted limited additional evidence describing his demeanor, there was no error. Here, as in *People v. Smith, supra,* 61 Cal.4th 18, such evidence was relevant to help the jury assess Ramirez's intent, state of mind, and credibility.

## II. *Prosecutorial Error*

Ramirez contends the prosecutor committed several errors requiring reversal of his conviction. Specifically, he claims the prosecution: shifted the burden of proof to the defense to produce evidence; misstated the law of heat of passion; improperly referred to his alleged lack of remorse; and misstated the reasonable doubt standard. We shall address each contention in turn.

### A. *Applicable Law*

"It is well[-]settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . is a necessary prerequisite to preserve a claim of prosecutorial [error] for appeal." (*People v. Seumanu*, (2015) 61 Cal.4th 1293, 1328.) Ramirez concedes his trial counsel did not object to some of the prosecutor's statements; therefore, we conclude as to those unobjected to statements that any claims of error are forfeited.

Ramirez preemptively argues trial counsel rendered ineffective assistance by failing to object to the prosecutor's arguments and statements. Thus, despite the forfeiture, we will address the merits of Ramirez's claims. To establish ineffective assistance, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and, as a result, the defendant suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) In reviewing this claim, we give significant deference to trial counsel's reasonable tactical decisions, and the " 'strong presumption that counsel's

9

conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 437, quoting *Strickland*, at p. 689.) It is not necessary to determine " 'counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland*, at p. 697.) " 'Surmounting *Strickland's* high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105.) And it is "particularly difficult" for a defendant to prevail on direct appeal on a claim of ineffective assistance by trial counsel. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' [Citations.] To establish such error, bad faith on the prosecutor's part is not required." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra,* 60 Cal.4th at p. 667.)

A prosecutor's conduct violates the federal Constitution when the conduct " 'infects the trial with such unfairness as to make the conviction a denial of due process' "; that is, when the conduct is " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " (*People v. Harrison* (2005) 35 Cal.4th 208, 242.)  A prosecutor's argument that does not render a criminal trial fundamentally unfair violates California law only if the conduct involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*)

B. *Analysis*

Ramirez claims the prosecutor shifted the burden of proof to the defense, and points to a colloquy at trial in which the prosecutor asked a police officer about the Leatherman tool that disappeared after Ramirez's arrest.  The prosecutor asked the officer whether the public defender's office has its own investigative team that can go out and hunt down evidence.  The court sustained defense counsel's objection that the prosecutor was shifting the burden of proof to the defense.

The prosecutor addressed this issue again during closing argument: "And then the knife issue, we keep coming back to that and I made some questions—asked some questions during my direct [examination] with [a detective] and I got objected to as if I was shifting the burden.  So I want to be very, very clear.  I am not shifting the burden here.  I know what the burden is very well.  I accept that burden.  I take that burden on.  Okay. What I'm saying is if there was any evidentiary value that was helpful to the defense they have prosecutors [*sic*]."

At that point, defense counsel objected that the prosecutor was shifting the burden to the defense.  The court admonished the jury:  "[W]hat the attorneys say during argument is not evidence.  They may argue the case

11

based on the evidence presented in the trial and reasonable inference[s] drawn therefrom.  It is up to you to determine whether the arguments of counsel are supported by the evidence presented at trial.  That question I did sustain an objection back at the time of trial and so the jury was—the jury is to disregard that question and what the answer would have been.  And so I'll just ask the People to move on to the next point."

We conclude the court properly sustained Ramirez's objection to the prosecutor's questioning of the police officer on the issue of burden shifting. Moreover, when the prosecutor referred to that issue again in closing argument, he clarified he understood the People's burden.  Defense counsel again objected, and the court admonished the jury that the arguments of counsel are not evidence.  In our view, the court's admonition cured any prejudice to Ramirez, and thus this claim fails.

Ramirez next contends the prosecutor erroneously stated the law on heat of passion by arguing in closing:  "[Provocation] doesn't apply here. What does it look like when it does apply?  This looks like when you come home and walk in on one of your neighbors molesting your kid in the act and the father blows up and takes it a little too far, blows the guy away or breaks his neck or whatever he does, and we as the community we say, 'You know what?  You can't have that.  I mean, but we get it.  It makes sense.'  So we're not—it's not malice.  It's—we're going to negate malice.  We're going to cut him a break because the average reasonable person would have just seen red based on that provocation and lost it and acted.  That's not what happened here."

Any error the prosecutor made in the above argument was cured because the court correctly instructed the jury regarding heat of passion,[2] and that it was to follow the court's instruction. The court also instructed the jury with CALCRIM No. 222 that the arguments of counsel is not evidence. We must presume the jury followed those instructions. (*People v. Najera* (2006) 138 Cal.App.4th 212.)

Ramirez contends the prosecutor erred by referring to his demeanor, as detailed above. As we have already explained, limited evidence on this topic was properly admitted. The trial court sustained defense objections to certain of the prosecutor's comments, and we presume the jury followed the court's instructions and disregarded these comments.

Ramirez contends the prosecutor misstated the reasonable doubt standard when it stated in rebuttal argument: "Look, reasonable doubt is doubt based on reason and we talked about that at the beginning. You're going to have an abiding conviction because you now heard all the evidence and that's not going to change. So you're going to come for a conclusion based on the evidence you heard, put it in the context of common sense and reasonability [*sic*], and you come to a verdict. [¶] So how do you know this

---

[2] The court instructed the jury with CALCRIM No. 570 regarding heat of passion as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection."

13

case has been proved beyond a reasonable doubt? Inevitably, somebody after this is going to ask you, 'What was that trial about you just sat through for two weeks,' right, Christmas dinner or whatever it may be? And what are you going to tell them? 'It's about this poor guy named Mr. Ramirez, ex-con. He just was misunderstood and this sinister retirement community [*sic*] had it out for him and conspired, and thank God we were there to instill justice in the situation?' Of course not; right? You're going to say, 'This is a crazy case about this guy who lost it over something so silly, and when a young man came over to try to get in between him and his elderly uncle, he got killed brutally and then he got through the wringer more than one time, but we sat through it all.' That's how you know that this case has been proved beyond a reasonable doubt. The defendant is guilty. Hold him accountable."

In determining whether the prosecutor committed error, it is significant that the trial court correctly defined the reasonable doubt standard in the jury instructions. (*Cortez, supra*, 63 Cal.4th at p. 131.)[3]

---

[3] The court instructed the jury with CALCRIM No. 220 on reasonable doubt: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

14

The court additionally instructed the jury on direct and circumstantial evidence with CALCRIM No. 224, stating in part, "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." The instruction further stated that if the jurors could draw two or more reasonable conclusions from the circumstantial evidence, they had to accept the one pointing to innocence.

The court also similarly instructed the jury with CALCRIM No. 225: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." The court instructed the jurors that in evaluating a witness's testimony, they could consider the reasonableness of the testimony in light of all the other evidence in the case, and that as to any opinion given by a witness at trial, they could "disregard all or any part of an opinion that [they] find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 333; see CALCRIM No. 226.)

The jury instructions left no doubt about the prosecution's burden of proof, the proper application of each juror's common sense and experience, and the role of reasonableness in reaching a verdict. To the extent the prosecutor's statement was inconsistent with the instructions, the jury was instructed to follow the latter. The trial court instructed the jury with CALCRIM No. 200, stating in part: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

15

Considered " '[i]n the context of the whole argument and the [jury] instructions' " (*Centeno*, *supra*, 60 Cal.4th at p. 667), the jury in this case was not reasonably likely to understand the prosecutor's comments as diminishing the prosecution's burden of proof.  We therefore conclude that even if the prosecutor erred, there was no prejudice given the instructions and entirety of the argument.

### III.  *Unanimity Instruction*

Ramirez contends the court erroneously failed to instruct the jury with CALCRIM No. 3500 that the jury must unanimously agree on the act causing Hermosillo's death, the stab or the kick.

Under the state and federal Constitutions, a unanimous jury verdict is required to convict a person of a crime.  (*Ramos v. Louisiana* (2020) 590 U.S. ___ [2020 WL 1906545]; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  This requirement is typically satisfied when the jury unanimously finds the defendant committed the alleged crime.  But that is not always the case.  As the California Supreme Court has explained, "[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Russo*, at p. 1132.)  This requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*)

This rule, however, has "several exceptions."  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)  Even when the evidence suggests more than one discrete crime, for instance, no unanimity is required if " ' "the acts alleged are so closely connected as to form part of one transaction." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 682.)  This "continuous conduct" exception

16

" 'applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' " (*Ibid.*)

Here, the evidence showed Ramirez kicked Hermosillo immediately after stabbing him, and promptly left the scene. His defense to both his stabbing and kicking was the same: he acted in self-defense. Therefore, the continuous course of conduct exception to the unanimity instruction requirement applies, and Ramirez's claim of error fails.

### IV. *Cumulative Error*

Ramirez contends the combined effect of the errors he identified requires reversal, as he was deprived of due process. Based on our review of the record, we conclude there was no error warranting reversal, whether considered separately or cumulatively. (*People v. Roybal* (1998) 19 Cal.4th 481, 531.) The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

### V. *Posttrial Motion*

The court denied Ramirez's motion to reduce his conviction from first degree murder to voluntary manslaughter or second degree murder under *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*). Ramirez contends that at the hearing on the motion, the parties treated it as one for a new trial under section 1181, subdivision (6), but the court in denying it erroneously relied on the standard for a judgment of acquittal under section 1118.1. He specifies: "Here, rather than acting as the '13th juror,' the trial court simply determined whether the jury's verdict was supported by substantial evidence." Ramirez alternatively contends his trial counsel provided

17

ineffective assistance by failing to move for a new trial under section 1181, subdivision (6).

A. *Background*

Following the jury verdict, Ramirez moved for a reduction of his sentence under *Dillon*, which applies if the punishment is "grossly disproportionate to the offense as defined or as committed, and/or to the individual culpability of the offender." (*Dillon, supra,* 34 Cal.3d at p. 450.) He argued: "In *Dillon,* the most compelling facts about the defendant were his extraordinary youth and the fact that even for a young person he was unusually immature, as demonstrated by the psychologist's report provided to the Court. Here, the most compelling fact about [Ramirez] is he was with [*sic*] the legitimate victim of a hit and run and following the suspect to prevent him from getting away. He never threatened the suspect in any way during their encounter."

The People opposed the motion: "The [d]efendant is essentially asking the court to accept a version of events that were [*sic*] specifically rejected by a jury to justify the extraordinary measure of reducing his conviction. Unlike [*Dillon, supra,* 34 Cal.3d 441], where the undisputed facts and the implication of the felony-murder rule gave rise to the contemplated relief, [d]efendant's articulated justification rests upon facts that were in dispute at trial. This dispute was put to rest after a fair trial by a jury of his peers."

At a hearing on the motion, although Ramirez's counsel mentioned *Dillon,* he in effect requested the court reweigh the trial evidence and "vacate the first degree murder conviction under . . . *Dillon* and instead find [Ramirez] guilty of voluntary manslaughter or at most a second degree murder." He continued: "Clearly, the defense had hoped for an acquittal based on self-defense, but we were prepared for a different outcome. We

18

thought voluntary manslaughter was a possibility and that worst case scenario, this was a second degree murder, at most. But a first degree murder conviction, in our opinion, was unfathomable. There was no—the evidence simply did not conclude that [ ] Ramirez intended to kill. He never expressed an intent to kill. He never said, 'I'm going to kill him.' He never—first degree murder requires an act to be willful—to be willfully, deliberately, and with premeditation. And here there was nothing that was willful."

The court in denying the motion did not address the *Dillon* criteria: "I'm mindful of the standard, which is that this court will review the evidence to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This was a jury trial and this was a verdict from the jury after they heard all the evidence and deliberated on this case for some time and they decided that the defendant intended to kill the victim and that he did meditate and deliberate. [¶] And so in determining whether a rational trier of fact could have found the defendant guilty of that first degree murder, I did consider the facts that came out at the trial, namely in terms of the circumstances surrounding this stabbing. The defendant did arm himself with a knife. And he didn't spend much time with the victim, but he did spend time with the victim in the sense that it wasn't moments—I mean, there was some time when he first got to the scene of where this all occurred, not this hit-and-run, but I'm talking about ultimately where this all happened. [¶] They moved to another location where it was just the defendant and the victim while the two witnesses . . . were a little bit of a distance away from them. And then there was some discussion between the defendant and the victim. And then at some point, in the middle of that, Mr. Ramirez took the time to flip his hat backwards before stabbing the victim directly in the neck, which ultimately Mr. Hermosillo fell back. And

19

while he was down on the ground, Mr. Ramirez kicked him in the head, when it was obvious that Mr. Hermosillo was completely incapable of responding in any way. [¶] And so those are the—that is the evidence that came out at the trial. That is part of the evidence that the jury heard. And based on that and the evidence, they came back with a first degree murder conviction. And at this point, in evidencing that, this court finds that a rational trier of fact could have found the defendant guilty of first degree murder. And I'm not going to disrupt the first degree murder verdict that the jury ultimately determined that the defendant was guilty of."

B. *Applicable Law*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507; see §§ 187, subd. (a), 189.) " 'A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 153 (*Breverman*), quoting § 192.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197 ["Lesser included offenses of first degree premeditated murder include second degree murder, voluntary manslaughter, and involuntary manslaughter"]; *Breverman*, at p. 154.)

" 'Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice when [he] acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or . . . kills in 'unreasonable self-defense'—the

20

unreasonable but good faith belief in having to act in self-defense." ' " (*People v. Rios* (2000) 23 Cal.4th 450, 460.) These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "*by negating the element of malice* that *otherwise inheres* in such a homicide." (*Breverman, supra,* 19 Cal.4th at p. 154.)

The California Supreme Court in *Porter v. Superior Ct.* (2009) 47 Cal.4th 125 set forth the difference between a motion under section 1118.1, which seeks a judgment of acquittal for insufficient evidence and a motion under section 1181, subdivision (6), which seeks a new trial because the verdict is contrary to law or evidence: "In ruling on an 1118.1 motion for judgment of acquittal, the court evaluates the evidence in the light most favorable to the prosecution. If there is any substantial evidence, including all inferences reasonably drawn from the evidence, to support the elements of the offense, the court must deny the motion. [Citation.] . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Id.* at p. 132.)

"The court extends no evidentiary deference in ruling on [a section] 1181[, subdivision] (6) motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt to *the judge*, who sits, in effect, as a '13th juror.' [Citations.] If the court is not convinced that the charges have been proven beyond a reasonable doubt, it may rule that the jury's verdict is 'contrary to the . . . evidence.' [Citations.] In doing so, the judge acts as a 13th juror who is a 'holdout' for acquittal. Thus, the grant of a section 1181[, subdivision] (6) motion is the equivalent of a mistrial caused by a hung jury." (*Porter v. Superior Ct., supra,* 47 Cal.4th at p. 133.)

Ramirez argues the court ruled on a new trial motion under section 1181, subdivision (6) based on its references to "whether a rational trier of fact could have found the defendant guilty." However, the more reasonable interpretation of the court's ruling is that it expressly applied the criteria for a judgment of acquittal under section 1118.1, which it articulated twice. The court repeatedly referred to the jury's verdict, evincing that it accorded it a level of deference consistent with the criteria for a ruling on a judgment of acquittal.

Ramirez alternatively contends his trial counsel provided ineffective assistance by failing to also move for a new trial under section 1181, subdivision (6). The trial court in ruling on the motion discussed the evidence in some detail and offered what were clearly its own independent conclusions. It focused on the fact that once Ramirez reached J.R.'s house, he had enough time to move to the back of his pickup, turn his hat backwards, and stab Hermosillo directly in the neck. Furthermore, Ramirez kicked Hermosillo's head. The court concluded, on its own terms, that Ramirez deliberated and acted with the required malice for first degree murder. Under the criteria set forth above for an ineffective assistance of counsel claim, Ramirez cannot show prejudice from his counsel's failure to specifically move the court for a ruling on a new trial under section 1181, subdivision (6). If defense counsel had done so, it would have been an idle act, as the court would most likely have denied it based on its independent analysis of the record set forth above.

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


KELETY, J.